### In re Robert Barlow and Barbara Barlow

[631 A.2d 853]

No. 91-491

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed August 13, 1993

*Lon T. McClintock* of *Jacobs, McClintock & Scanlon*, Bennington, for Appellants.

*Jeffrey L. Amestoy*, Attorney General, and *John H. Hasen*, Assistant Attorney General, Montpelier, for State.

**Dooley, J.** Petitioners Robert and Barbara Barlow appeal a ruling by the Vermont Environmental Board requiring them to

obtain an Act 250 permit to continue operating their gravel pit. They argue that their operation is exempted from review by 10 V.S.A. § 6081(b) because it preexisted the enactment of Act 250. The State has moved to dismiss this appeal, contending that the action is moot because petitioners have now received a permit. We deny the State's motion to dismiss and affirm the Board's decision that petitioners' gravel operation is not exempt from the Act 250 permit requirements.

The land now known as the Barlow gravel pit was purchased in 1959 by Joseph and Martha Sarkis. At that time, the lot consisted of a 122-acre parcel on Dean Road in the Town of Pownal. Some years later, portions of the lot were sold, including a four-acre lot now owned by Harriet Burdick.

Gravel extraction on the parcel occurred as early as 1940. Prior to 1970, gravel extraction occurred only on the eastern portion of the lot, while sand and dirt, but no gravel, were extracted from the western portion. The owners did not operate the gravel pit; independent contractors such as John W. Patterson, Sr. and the Town of Pownal worked the pit and paid the owners for the gravel they removed. Exact records were not maintained, and the most reliable source regarding the extraction of gravel from the pit is Patterson, who took gravel from the property from 1966 through 1978. The Board accepted Patterson's testimony that the annual extraction rate from 1966 through 1970 ranged between 5,800 and 11,200 cubic meters of gravel, sand, and sand and dirt fill, and that the pit was not used on a daily basis. The extraction rate remained approximately the same for the years 1970 through 1977.

In 1978, Harwood and Lauretta Moore purchased the property. In May 1978, the district coordinator for the District 8 Commission issued to the Moores a project review sheet that stated:

> (Tentative as of 5-18-78) Purchase of existing continuously used gravel pit from Joseph Sarkis for identical use by Harwood D. Moore. Currently 2+ acres are opened and possibly up to 15–20 acres of the 100 contain saleable earth resource. New owner would probably be removing 100–200 [cubic yards] per day for sale in Massachusetts. No [Act 250] permit required unless operation substantially changes.

From 1978 to 1982, the Moores increased the extraction rate to approximately 26,000 cubic yards per year. In addition, the gravel extraction operation was extended to the western portion of the property because the eastern portion was nearly exhausted.

In 1983, petitioners purchased the western portion of the parcel, as gravel extraction had ceased on the eastern portion of the land the previous year. They continued gravel extraction on the western portion and extracted from 14,727 to 55,562 cubic yards per year between 1983 and 1990, averaging approximately 26,000 cubic yards per year. Petitioners have operated the pit on a daily basis.

The gravel pit on the western portion has expanded over the years to comprise an approximately nine-acre area, and now has approached to within 150 feet of the Burdick land. As a result, pit operations have become more audible to the residents of that property. Petitioners plan to continue gravel extraction at the same average rate of 26,000 cubic yards per year that they maintained during the 1980s.

While applying for a waste disposal permit, petitioners were advised to discover whether they were required to obtain an Act 250 permit. They did so and initially were told they did not need a permit. On June 14, 1989, the district coordinator reconsidered and determined that a permit was required. The Board's executive officer affirmed this determination.

Petitioners appealed, and the Environmental Board affirmed. It found that there had been three changes in the gravel pit operation: (1) petitioners used a portable stone crusher where none had been used before; (2) the annual extraction rate had greatly increased since 1970; and (3) the frequency of gravel extraction had increased, from a sporadic undertaking to a daily occurrence. It found that the latter two changes were "substantial" and triggered the need for a permit. See 10 V.S.A. § 6081(b) ("any substantial change" to preexisting development triggers Act 250 jurisdiction). It explained its rationale as follows:

> In making this determination, the Board is examining not whether the impacts *actually* exist, but whether they *potentially* exist. The Board is only evaluating whether a permit is required because of the potential for significant

impacts, and it is for the District #8 Commission, following submission of a permit application, to review the projects impacts in deciding whether to issue a permit.

(Emphasis in original.) The Board also rejected petitioners' argument that it was estopped from finding Act 250 jurisdiction because petitioners reasonably relied on the 1978 project review sheet.

After commencing of this appeal, petitioners applied for and were granted an Act 250 permit for their gravel operation, subject to specified conditions. The State has moved to dismiss this appeal, claiming that the permit renders it moot.

■ ■ Before addressing the merits, we must determine whether this appeal is moot.* As a general rule, a case is moot if "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *In re Moriarty*, 156 Vt. 160, 163, 588 A.2d 1063, 1064 (1991). The controversy must remain alive through the course of appellate review. *Id.* A case can become moot because the appellant obtains relief by another means. See *Town of Cavendish v. Vermont Pub. Power Supply Auth.*, 141 Vt. 144, 147, 446 A.2d 792, 793 (1982). Any alternative relief, however, must be complete so that "nothing further would be ordered by the court." 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.2, at 238 (2d ed. 1984).

■ ■ This case does not meet the test of mootness for three reasons. First, petitioners have simply complied with the order of the Board during the pendency of this appeal because of the coercive effect of that order. Compliance with a judgment pending appeal does not make a case moot "unless the parties in-

---

* The State asserts that the issue is controlled by an unpublished entry order in *K.E.V., Inc. v. Environmental Bd.*, No. 88-359 (Dec. 4, 1989), and has provided us papers from that case to show that the cryptic order really means that obtaining a permit moots any claim that there is no Act 250 jurisdiction. We are unwilling to give controlling effect to an unpublished decision. We note also that we have decided cases in a similar posture. See *In re Vermont Gas Sys., Inc.*, 150 Vt. 34, 549 A.2d 627 (1988); *In re Baptist Fellowship of Randolph, Inc.*, 144 Vt. 636, 481 A.2d 1274 (1984). In any event, this decision represents the first in-depth analysis of the mootness issue and is not foreclosed by the cursory action, and inaction, that came before.

tended to settle, or unless it is not possible to take any effective action to undo the results of compliance." *Id.* at 247. Similarly, compliance with injunctions or specific orders will not moot the appeal "if it remains possible to undo the effects of compliance or if the order will have a continuing impact on future action." *Id.* at 249. The facts here indicate that if petitioners prevail in this appeal, the effects of compliance would be immediately reversible.

This principle applies to orders of administrative agencies. An illustrative example is *Metropolitan Transportation Co. v. Pennsylvania Public Utility Commission*, where the governing state agency denied the request of a taxicab company to self-insure and ordered the company to purchase third-party insurance or cease operating. 563 A.2d 228, 229–30 (Pa. Commw. Ct. 1989). The taxi company made the mandatory purchase during its appeal in order to remain in operation. The court refused to dismiss the case as moot because the company continued to desire to operate without outside insurance and thus had a "necessary and continuing stake in the outcome." *Id.* at 230. The court added that it wanted to encourage parties in the position of the taxi company to operate in compliance with the law and would not discourage such compliance by a ruling that renders this type of appeal moot. *Id.* The same reasoning is directly applicable here.

█ The second reason this appeal is not moot is that the relief petitioners seek is different from that provided by obtaining their permit. The fact that petitioners have received a permit is irrelevant to the issue presented by this appeal. They seek to operate entirely free of Act 250 regulation and the numerous restrictions and conditions that accompany the permit. Petitioners should be able to pursue the separate claim that they do not need a permit and do not have to abide by its conditions. See *Miesz v. Village of Mayfield Heights*, 111 N.E.2d 20, 22 (Ohio Ct. App. 1952) (receipt of zoning permit did not moot landowner's attack on constitutionality of zoning ordinance); cf. *Polak v. Kavanah*, 368 N.Y.S.2d 563, 565 (App. Div. 1975) (gravel pit owner may attack zoning ordinance without seeking permit because permit would not give adequate relief where operation of ordinance allegedly constituted present invasion of property rights).

■■ Finally, the appeal is not moot because its resolution could have a significant impact on the value of petitioners' land and their ability to use it for its present purpose. If a permit is required, the value of their land could be significantly reduced due to the restrictions created by Act 250 jurisdiction. The limitations inherent in operating under the permit are significant, even though the permit conditions are not improper if Act 250 jurisdiction is found. Alternatively, if no permit is required, petitioners' land would retain its value as determined independently of any Act 250 permit considerations. Thus, the controversy is still clearly live.

The Attorney General, acting as counsel to the Board, asserts two other bases for dismissing the appeal. The first is that, by accepting the permit, petitioners are estopped from challenging Act 250 jurisdiction. This theory is not applicable in the circumstances present here, where the applicant complies with an order to obtain a permit to avoid penalties or, alternatively, the loss of its business. *Begin v. Inhabitants of Sabattus,* 409 A.2d 1269, 1272 (Me. 1979). Because the Board compelled petitioners to seek a permit, they are not estopped from challenging the Board's jurisdiction.

■ The second ground is that petitioners are manipulating the process by inconsistent actions so that "equity and economy require dismissal." We do not agree that attempting to obtain a definitive ruling on Act 250 jurisdiction while remaining in business is manipulation. If the Board had an alternative method for petitioners to achieve these proper goals, the objection would be appropriate. Under these circumstances, our endorsement of this objection would effectively insulate the Board's decisions from review.

Given petitioners' legitimate interest in a resolution of the issues presented here, the continuing impact on future rights that Act 250 jurisdiction carries with it, and the potential for a significant change in the value of the property, this appeal is not moot. We therefore proceed to examine the merits.

On the merits, petitioners make three arguments: (1) the Board applied the wrong legal standard to determine whether a permit was needed; (2) under any standard, the findings do not support the conclusion that a permit is needed; and (3) the Board is estopped from requiring a permit. The first argument

is a challenge to the Board's conclusion that it need find only potential impacts on Act 250 criteria to determine that a substantial change of use has occurred and that a permit is required. The governing statute states that any "substantial change" in the use of the subject property disqualifies such property from the grandfather clause exemption to the Act 250 requirements, and therefore necessitates a permit for its continued operation or development. See 10 V.S.A. § 6081(b). The Board acted under Environmental Board Rule (EBR) 2(G), which defines when a "substantial change" has occurred. The rule looks to whether a change "*may* result in significant impact with respect to any of the criteria specified in 10 V.S.A. section 6086(a)(1) through (a)(10)." EBR 2(G) (emphasis added). Petitioners' claim that the rule is invalid if it means that a potential impact is sufficient to find a substantial change, and that it therefore cannot be interpreted as looking only at potential impacts.

The claim of invalidity cannot be sustained. We have specifically upheld the validity of EBR 2(G) in similar cases. See *In re H.A. Manosh Corp.*, 147 Vt. 367, 369, 518 A.2d 18, 19 (1986); *In re Orzel*, 145 Vt. 355, 360, 491 A.2d 1013, 1016 (1985). More importantly, however, in 1985, the Legislature, "in unambiguous terms," ratified all Board rules relating to administration of Act 250, including EBR 2(G). *In re Spencer*, 152 Vt. 330, 336, 566 A.2d 959, 962 (1989); see 1985, No. 52, § 5. Thus, we must give EBR 2(G), as well as other rules relating to the administration of Act 250, "the same effect as . . . any law passed by the Legislature in the first instance. It has effectively become part of the Act 250 legislative scheme codified at chapter 151 of Title 10." *Spencer*, 152 Vt. at 336, 566 A.2d at 962.

We also disagree with petitioners' interpretation claim. In interpreting agency regulations, "the primary rule is to give language its plain, ordinary meaning." *Slocum v. Department of Social Welfare*, 154 Vt. 474, 478, 580 A.2d 951, 954 (1990). By defining "substantial changes" to include changes that *may* result in significant impact, the plain language of EBR 2(G) does not limit Act 250 jurisdiction to changes that produce actual impact on the statutory criteria. Moreover, we accord substantial weight to an agency's interpretation of its own rules. See *In re Killington, Ltd.*, 159 Vt. 206, 210, 616 A.2d 241, 244 (1992).

For these reasons, we conclude that potential significant impact will satisfy the regulatory requirements.

Petitioners argue that this conclusion is inconsistent with our decision in *Manosh*, where we stated that we did "not necessarily disagree" with the assertion that a determination of substantial change requires the finding of an actual, rather than potential, impact. 147 Vt. at 370, 518 A.2d at 20. Reliance on *Manosh* is misplaced, however, as in that case there was evidence supporting a finding of actual impact, and we found it unnecessary to reach the issue now before us. Further, *Manosh* came before our decision in *Spencer* noting that the Legislature had ratified the Board's rules.

Our concern, in both *Manosh* and the instant case, is that sufficient emphasis be placed on the significance of any potential impacts found by the Board. We recognize that too loose an interpretation of EBR 2(G) effectively eliminates this element of the substantial change test. Any change of use has the potential for some impact on the statutory criteria. Thus, while we agree that the Board may act on potential impacts, we believe a finding of *significant* impacts is necessary if the requirement of "substantial change" is not to be illusory. The Board may not merely look, as petitioners suggest, for any potential impact, but must find that any such impacts are significant.

Understandably, the Board has been unwilling to specifically define the term "significant." Often, the determination as to whether there is a potential significant impact is inextricably fact-bound and not susceptible to the application of preset definitional rules. Such determinations, however, are within the Board's area of expertise and enjoy a presumption of validity. See *Killington, Ltd.*, 159 Vt. at 210, 616 A.2d at 244.

Petitioners next claim that the conclusion there was a substantial change is unsupported by the findings, whatever standard is used. "On appeal, an agency's conclusions of law will be upheld if they are fairly and reasonably supported by the findings of fact." *Orzel*, 145 Vt. at 359, 491 A.2d at 1015. The findings of fact show that both the extraction rate and the frequency of usage of the gravel pit have increased since the 1970 enactment of Act 250. The evidence shows that the yearly extraction rate has been as high as five times the pre-Act 250 rate,

and its average has reflected at least a 150% increase over the highest pre-Act 250 figure. The Board also found that there was a "greater number of larger trucks entering and exiting the pit on a daily instead of a sporadic basis," which contributed to traffic, pollution, and aesthetic concerns.

Petitioners do not challenge these findings of fact, arguing only that the findings do not support the conclusions. We hold that the findings support the Board's conclusion that petitioners' operation of the gravel pit constitutes a substantial change to the development, as defined in the regulatory framework. Therefore, we will not disturb the Board's decision that petitioners are subject to Act 250 jurisdiction.

Finally, petitioners argue that the Board should be estopped from requiring them to obtain an Act 250 permit because they reasonably relied on the 1978 project review sheet to establish the historical rates of extraction for the property. Although the Board, in its ruling, stated that petitioners had not specifically argued equitable estoppel, it did recognize that this theory was the basis of petitioners' claim regarding the effect of their reliance on the project review sheet. It also briefly indicated its belief that, on a substantive level, at least one of the elements of estoppel had not been met. The State makes no argument that petitioners are barred from raising this claim on appeal, and we will therefore consider its merits.

To prevail, petitioners must prove each of the elements of equitable estoppel: (1) the party to be estopped must know the facts, (2) that party's conduct must be intended to be acted on by the other, or reasonably perceived as such, (3) the party asserting the estoppel must be ignorant of the true facts, and (4) the party asserting the estoppel must rely on the other party's conduct, causing injury. *In re McDonald's Corp.*, 146 Vt. 380, 384, 505 A.2d 1202, 1204 (1985).

Petitioners' estoppel claim founders upon the first of these elements. In view of the uncontested evidence as to the historical extraction rate, the language of the project review sheet demonstrates that the Board had an incomplete knowledge of the relevant facts when the review sheet was issued, and therefore could not have given petitioners' predecessors in title any assurances upon which they or later owners were enti-

tled to rely. According to petitioners the review sheet specifies an extraction rate that is roughly comparable to the rate that both petitioners and their predecessors, the Moores, have maintained. The sheet was issued to the Moores, however, for "identical use" to that of the previous owners. The evidence received by the Board shows that the Moores' use was *not* identical to that of the previous owners; indeed, it grew substantially, from an annual high of approximately 11,200 cubic yards to an annual average of 26,000 cubic yards. Thus, the project review sheet is internally inconsistent. It is apparently the product of incomplete or inaccurate information on the part of the inspector who issued it. At the least, petitioners are unable to establish that the party to be estopped—the Board—knew the relevant facts. As they cannot prove this first requisite element of estoppel, their claim fails, and we need not examine the remaining elements.

We note, however, that petitioners' estoppel claim fails for two other reasons. We have previously addressed the issue of whether the Board may be estopped from finding a substantial change because of prior representations made by an environmental agency employee. See *Orzel*, 145 Vt. at 361, 491 A.2d at 1016. In *Orzel*, we stated that to hold that "the representation by the Agency's inspector prevents the Board from ever finding that petitioners need a permit fails to give meaning to the 'substantial change' language of the statute." *Id.* at 361, 491 A.2d at 1017. The governing statute clearly specifies that substantial changes trigger the permit process. It would defeat the legislative intent to allow the statutory requirement to be avoided in this way. See *In re Agency of Administration*, 141 Vt. 68, 80, 444 A.2d 1349, 1355 (1982) (remarks of state employee will not color court's construction of legal language). This reasoning holds especially true here, where the representations were based on inaccurate information and were, at best, highly ambiguous.

Further, petitioners face an added burden in that they are asserting estoppel against an agency of the state. "This Court is reluctant to apply estoppel against the state unless there are 'extraordinary circumstances' or the 'injustice which would result from a failure to uphold an estoppel is of sufficient dimensions to justify any effect upon public interest or policy

which would result from the raising of an estoppel.'" *Spencer*, 152 Vt. at 342, 566 A.2d at 966 (quoting *In re McDonald's Corp.*, 146 Vt. at 383, 505 A.2d at 1203–04). We find no "extraordinary circumstances" or substantial injustice here that would compel us to recognize petitioners' estoppel claim.

*Affirmed.*

**Allen, C.J.**, concurring in part and dissenting in part. While I agree with the majority's treatment of the mootness and estoppel issues, I dissent from its affirmance of the Environmental Board's conclusions regarding significant impacts.

The Board established a two-part test to invoke Act 250 jurisdiction. Once the Board finds a change in development, the second prong of the test is that the Board must find that the change has caused a significant impact under one or more of the ten criteria. *In re H.A. Manosh Corp.*, 147 Vt. 367, 370, 518 A.2d 18, 20 (1986). There, the Board examined for and found actual and potential impacts. In this case, the Board has departed from this test and relied solely on potential impacts. It emphasized in its opinion that it did not determine whether there were actual impacts, but only whether there were potential impacts. Its findings indicate that the increased extraction rate had been in existence for some twelve years and that the change from sporadic to daily use had probably existed for that same period, although the findings are not totally clear on this point. The failure to determine whether impacts actually exist because of the changes during this period is incomprehensible. Although we give substantial weight to an agency's interpretation of its own rules, this deferential level of review does not equate with passivity in determining the propriety of these interpretations. *In re Vitale*, 151 Vt. 580, 583, 563 A.2d 613, 615 (1989).

The Board found that there were three changes at issue: the use of a crusher at the pit, a significant increase in the yearly extraction rate, and a change after 1970 from sporadic use to daily use. It concluded that the crusher did not have the potential for significant impacts but that the increase in the rate of

extraction and the frequency of use did.* The potential impacts relied upon were an increase in noise, which might impact on air pollution and aesthetics, and an increase in trips, which has the potential for significant impacts on traffic safety and congestion, air pollution and aesthetics. The findings are sparse or nonexistent on these potential impacts. With respect to noise, they indicate that "the pit is now approximately 150 feet from the closest edge of the Burdick tract" and as a result pit operations have become more audible to persons residing on that tract. This finding might support a conclusion of actual impact, but it hardly supports a conclusion of potential impact. The findings do not indicate whether the pit operation will come closer to the Burdick property with a resulting increase in noise or will move away with a decrease. The increase in the number of trips (from ten or twelve to sixteen) is characterized by the Board as slight, and it is not explained how a slight increase in number has the potential for a significant impact. The Board made no attempt to determine whether the increase over the twelve-year period had had any adverse impact on the criteria with which it was concerned.

An examination for potential impacts makes sense in a case where the change in the development is immediately challenged and actual significant impacts cannot be ascertained. But where, as here, the changes occurred years ago, it is absurd not to determine whether they have substantially impacted any of the criteria. At the very least, the impacts from what has occurred and what is actually occurring should be examined in deciding whether potential impacts may result. The Board studiously avoided doing this. The order should be reversed and the matter remanded with a direction to consider the actual impacts of the changes found.

---

* Interestingly, in its proposed findings and conclusions the Board concluded that the change in operation had not increased the noise and traffic and that the gravel pit was exempt from the Act 250 permit requirement. It concluded otherwise in its final order with no change in the findings of fact.