2007 VT 102

### In re HALE MOUNTAIN FISH AND GAME CLUB, INC.

[939 A.2d 498]

No. 05-520

¶ 1. September 13, 2007. Neighbors of Hale Mountain Fish and Game Club, Inc. appeal the Environmental Board's decision requiring the club to obtain an Act 250 permit for certain specified improvements made since 1970, but concluding that a permit is not required for comprehensive review of the entire facility, which preexisted Act 250. We reverse and remand the matter for further factfinding.

¶ 2. Hale Mountain is a field sports club and shooting range located on approximately 215 acres of land in Shaftsbury, Vermont. The Bennington Rod and Gun Club acquired the original 200-acre tract in 1947 and merged with another club in 1969 to form Hale Mountain. The club purchased an additional fifteen-acre parcel in 1989 to reach its current size. Over the years, Hale Mountain made numerous improvements to the facility, which were never reviewed under Act 250. In the 1990s, Hale Mountain and neighboring landowners attempted to resolve issues concerning the timing and frequency of shooting at the club, but disagreements persisted. Eventually, neighbors sought an opinion from the District 8 Environmental Commission Coordinator on whether the changes at the club triggered Act 250 jurisdiction. In a June 2004 decision, the district coordinator concluded that both material and substantial changes at the facility necessitated Act 250 review. The district coordinator noted that, since 1970 when Act 250 became law, the club had made multiple improvements to its facility and had increased the frequency of its activities by maintaining a year-round caretaker on the premises, increasing law-enforcement-qualification shoots, expanding the number of special-event shoots, facilitating year-round shooting hours, and installing equipment that allowed shooting by more people at a single time. The district coordinator determined that the physical and operational changes to the facility had the potential, as a result of the frequency and intensity of noise and other consequences, to have significant impacts on the neighbors' property interests.

¶ 3. Hale Mountain appealed to the Environmental Board, which rendered a decision in August 2005 after holding a two-day evidentiary hearing. Of the nine-member board, four members concluded that no Act 250 permit was necessary, three members concluded that a permit was necessary for the entire project, and two members concluded that the permit should be restricted to a review of three

discrete improvements that occurred at the facility: (1) installation of a new well and wastewater disposal system in 1983; (2) installation of a replacement garage and new clay-target storage trailer; and (3) improvements in connection with the commencement of a beagle club in 1979. Consequently, the Board issued a plurality decision limiting Act 250 review to the aforementioned improvements. On appeal, neighbors argue that, as matter of law, the documented cumulative changes to the club had the potential to result in significant impacts under the Act 250 criteria, and thus the Board erred by not requiring comprehensive Act 250 review. Alternatively, neighbors contend that the Board failed to make essential findings on issues that they raised before the Board, and that, even if this Court rejects their argument that the evidence and the Board's findings require comprehensive Act 250 review as a matter of law, we should remand the matter for further factfinding.

¶ 4. Before considering these arguments, we review the relevant law, as acknowledged by both parties. Act 250 requires that a land-use permit be obtained before commencing construction on a development. 10 V.S.A. § 6081(a). Although this permit requirement does not apply to projects constructed before June 1, 1970 — the date that Act 250 became law — it does apply "to any substantial change" in a preexisting development. *Id.* § 6081(b); see *In re Orzel*, 145 Vt. 355, 361, 491 A.2d 1013, 1017 (1985) ("Because a development is exempt at one time does not mean it will always be exempt."). Under Environmental Board Rule 2(G),[*] which "has effectively become part of the Act 250 legislative

scheme," a substantial change is any change in a development or subdivision which *"may* result in significant impact with respect to any of the criteria specified in 10 V.S.A. section 6086(a)(1) through (a)(10)." *In re Barlow*, 160 Vt. 513, 521, 631 A.2d 853, 858 (1993) (internal quotation and citation omitted). By defining the term "substantial change" to include any changes that may result in significant impacts, the plain language of the rule "does not limit Act 250 jurisdiction to changes that produce actual impact on the statutory criteria." *Id.* Thus, the Board may find jurisdiction based on potential impacts as long as they are significant. *Id.* at 522, 631 A.2d at 859. As the Board explained in its decision, the substantial-change question involves a two-part inquiry in which it determines whether there has been a cognizable physical change to the preexisting development, and if so, whether the change has the potential for significant impact under one or more of the ten Act 250 criteria. See *Sec'y, Vt. Agency of Nat. Res. v. Earth Constr., Inc.*, 165 Vt. 160, 164, 676 A.2d 769, 772 (1996); *In re H.A. Manosh Corp.*, 147 Vt. 367, 369-70, 518 A.2d 18, 20 (1986).

¶ 5. The Board has also distinguished between changes in preexisting developments that trigger evaluation of the whole development, including the preexisting part, and those that require consideration only of the changes. In a case factually similar to this one, the Board concluded:

> the Board has consistently determined whether the activities and impacts which require a permit as a substantial change can be differentiated from the pre-existing activity and its impact. Where they can, then only those activities and impacts require a permit. However, where the activities cannot be distinguished, the Board has concluded that the

---

[*] The Natural Resources Board Land Use Panel, which has succeeded the Environmental Board, has adopted a rule identical to Environmental Board Rule 2(G).

entire operation and all of its impacts require an Act 250 permit.

*In re Black River Valley Rod & Gun Club, Inc.*, 1997 WL 453353, at *10 (Vt. Env'l Bd. 1997). In that case, neighbors to a preexisting shooting club claimed that improvements in the facilities had resulted in increases in the intensity and hours of use such that Act 250 jurisdiction had attached to the entire shooting club operation. The Board agreed with respect to the trap shooting with the following analysis:

> In this case, the substantial changes to the Club are the Pavilion and the Lights. The Club and the Neighbors offered conflicting testimony as to the operational impacts of the Pavilion and the Lights. The Board finds the Neighbors' testimony regarding the impacts of the Pavilion and the Lights to be credible. Therefore, the Board concludes that the Pavilion and Lights have resulted in a substantial increase in the amount of shooting at the trap range above the historic amount of shooting. Specifically, the impacts of the Pavilion and Lights are that shooting at the trap range has occurred on more days and for longer periods of time following construction of the Pavilion and installation of the Lights. The Pavilion provides shooters and their belongings with protection from the elements, thereby enabling shooting to occur for longer periods of time than before the Pavilion was built, even during inclement weather. The Lights enable shooting at the trap range to continue later into the night than it did prior to the installation of the Lights. Additionally, since constructing the Pavilion and installing the Lights, the Club has sponsored more formal trap shooting competitions than it did previously. The Board concludes that the above operational impacts of the Pavilion and Lights permeate the trap range because the increased amount of shooting caused by the Pavilion and Lights cannot be differentiated from the preexisting shooting at the trap range. Therefore, the Board concludes that it has jurisdiction to regulate the shooting at the trap range.

*Id.* at *12. Neither party in this case contests the standard applied by the Board in *Black River*, and we adopt it without further analysis for purposes of this case.

¶ 6. In its plurality decision, the Board set forth detailed findings on the various improvements and changes made by Hale Mountain since 1970. In particular, with respect to improvement of the shooting facilities, the Board found that since 1970 the club, among other things, had begun allowing state police to use the shooting range for qualifying and practice, had formed a shooting-activities committee to generate more use of club facilities, had started weekly shoots on Wednesdays and Sundays, had done earthwork to create a berm to separate the pistol and rifle ranges, had begun plowing the road to the club during the winter, had widened the rifle range, had installed covered structures over the rifle and pistol ranges, had removed trees and vegetation, had allowed local police to use the facility, had constructed a storage unit and installed new trap machines, and had posted a flyer at Wal-Mart advertising trap shooting on Sundays at the club. The Board also noted the testimony of neighbors stating that noise from shooting at the club intensified significantly from the mid 1980s through the 1990s.

¶ 7. The Board then concluded that Hale Mountain was a preexisting development, and that many, but not all, of the changes that the club had made over the years were cognizable physical changes to the preexisting development. The Board further determined that installation of a new water supply and wastewater disposal system, a new garage and storage trailer, and various improvements related to a beagle club had the potential to have a significant impact on specific Act 250 criteria. The only other category of changes that the Board examined was improvements made to the club's shooting facilities. On this point, the Board noted that there had been conflicting testimony on whether the noise and intensity of use at the club had increased over the years, but that it was not persuaded that the various improvements to the shooting facilities "actually resulted in any significant increase in use of the Project" or "had the potential for significant noise, traffic, or other impacts beyond those of the preexisting development." While acknowledging that increases in impacts such as noise and traffic require comprehensive permit review when they permeate an entire development, the Board concluded that an Act 250 permit is not required for the entire club in this case because the changes are "distinct and isolated." Three members of the Board who concurred on requiring a permit for the three delineated changes argued further that a permit was needed for the entire project because: (1) improvements to the shooting facilities, at a minimum, had the potential to increase shooting activities — and thus noise — at the club; and (2) the only witnesses who lived near the club provided credible evidence of actual and significant increases in use and noise levels since the improvements were made.

¶ 8. After careful review of the record, we cannot determine whether the evidence and the Board's findings, as a matter of law, compel Act 250 jurisdiction over the entire development under the *Black River* standard, insofar as the Board has failed to make adequate findings on the most critical issue in this case — whether, and to what extent, intensity of use and noise levels have increased at the club since 1970 and, if so, the cause of the increased noise. Although neighbors raised many issues concerning the impact of changes on each of the Act 250 criteria, the issue at the heart of this case was whether the various improvements and changes at the club since 1970 had resulted in an increased intensity of use — and therefore increased noise — which would have a potential impact under at least two of the criteria set forth in 10 V.S.A. § 6086(a). There was considerable testimony by both sides concerning the level of use at the club throughout the years. In particular, several neighbors testified about a significant increase in activity from the mid 1980s through the 1990s, allegedly resulting in far more traffic and much more frequent shooting. Given the central role of the alleged increased intensity of use at the club and the considerable testimony on this point, it was critical for the Board to make adequate findings and conclusions on the extent of change with respect to the level of shooting at the club since 1970.

¶ 9. The Board's analysis in this case is deficient in comparison to the analysis in *Black River*, the factually similar precedent. There, the Board made a finding on the increase in the amount of shooting, and further determined the causal relationship between the increase in the amount of shooting it found and the changes that had occurred at the site after the effective date of Act 250. Here, the Board did not address this critical issue head on. At the conclusion of its findings, the Board briefly noted that two neighbors had testified about the significant increase in the level of shooting in the 1990s. But, as we have stated on

numerous occasions, " '[a] recitation of evidence in findings is not a finding of the facts contained in the testimony related and it cannot be so construed.' " *Embree v. Balfanz*, 174 Vt. 560, 562, 817 A.2d 6, 9 (2002) (mem.) (quoting *Krupp v. Krupp*, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967)). In its conclusions, the Board repeated its *Krupp* findings that the neighbors had testified to a significant increase in use, noted that the club's witnesses testified that the level of activity had remained constant since 1970, and then concluded without any further exposition of facts or analysis that it was not persuaded that the improvements at the club actually or potentially resulted in any significant increase in use or had an impact on the relevant Act 250 criteria.

¶ 10. We do not find sufficient the Board's conclusion that it was unpersuaded that the changes in the facilities and their operation "actually resulted in any significant use increase in use of the Project." Without findings on the critical testimony concerning the alleged increased shooting, we cannot review the determination as to whether there is a potential significant impact, which "is inextricably fact-bound." *Barlow*, 160 Vt. at 522, 631 A.2d at 859; see *Sec'y, Vt. Agency of Nat. Res. v. Upper Valley Reg'l Landfill Corp.*, 167 Vt. 228, 242, 705 A.2d 1001, 1010 (1997) ("We will remand if we are left in a position where we must speculate as to the basis of the decision reached . . . ."). We recognize that the inadequacy of the findings compared to *Black River* may have arisen because of the deep divisions in the Board over the conclusions. For example, the dissent of the members who would have found that the changes permeate the entire project noted that "[t]he improvements also facilitated the use by law enforcement agencies, which is a new and increased use." The findings did not address this point, possibly because they may have had significant influence over the conclusions. In these circumstances, it is critical that we have a complete set of findings on all relevant issues to ensure that a majority of the Board has reached the result on a consistent rationale or rationales.

¶ 11. Although we have highlighted the lack of findings on the most critical issue in this case — changes in the intensity of use and noise—the Board also failed to make findings and conclusions on other issues on which the parties presented substantial testimony and legal arguments, including the impact of improvements at the club on streams and wetlands. We recognize that the Board is "not required to rule individually on each request, but [its] opinion must at least show that [it] considered and ruled upon each proposed finding." *Upper Valley*, 167 Vt. at 241-42, 705 A.2d at 1009. This is particularly true when an issue is the subject of extensive testimony and briefing.

¶ 12. Given the lack of adequate findings on the most critical issue in this case, we must remand the matter for further factfinding.

*Reversed and remanded.*