STATE OF VERMONT

| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 143-10-12 Vtec |
|---|---|
| N.E. Materials Group LLC A250 JO #5-21 | DECISION ON THE MERITS |

**Decision on the Merits**

Thirteen citizens, collectively "Neighbors for Healthy Communities" (Appellants), appeal a September 28, 2012 jurisdictional opinion (JO) of the District 5 Environmental Commission Coordinator (District Coordinator), which determined that North East Materials Group, LLC's (NEMG) rock crushing operations, located at the Rock of Ages (ROA) quarry in the Town of Barre, Vermont,[1] do not require an Act 250 permit.[2] Appellants' Statement of Questions poses 11 questions for this Court's review. In a May 9, 2013 decision, we denied in part and granted in part Applicants' motion to clarify and dismiss certain questions within Appellants' Statement of Questions. Appellants' Questions 1 through 4 and 6 through 9 remain at issue for this merits decision. In a November 22, 2013 decision, we denied Appellants' motion for summary judgment, denied Appellants' motion to strike and preclude, and denied Applicants' motion to strike.

---

[1] Although this appeal is captioned "In re North East Materials Group, LLC," the Rock of Ages Corporation, the owner and operator of the Rock of Ages quarry, is also an appellee. NEMG and Rock of Ages Corporation are referred to collectively as "Applicants" or "Appellees," unless otherwise noted.

[2] The procedural history of this appeal is as follows:

- November 2, 2010: District Coordinator Ed Stanak issued a JO finding that the addition of a crusher at the quarry did not constitute a substantial change to a development in existence prior to enactment of Act 250 and therefore no Act 250 permit was required.

- May 3, 2012: Appellants requested a JO on whether the addition of a crusher constituted a substantial change.

- May 16, 2012: District Coordinator Boolie Sluka issued a JO affirming District Coordinator Stanak's November 2, 2010 JO. Appellants requested reconsideration of District Coordinator Sluka's decision.

- September 28, 2012: District Coordinator Warren Foster issued a JO affirming District Coordinator Sluka's May 16, 2012 decision, again finding that Applicants' rock crushing operations do not constitute a substantial change and therefore do not require an Act 250 permit. Appellants' appeal of District Coordinator Foster's September 28, 2012 decision is now before us.

In 2009, NEMG began operating the rock crushing at issue subject to a December 17, 2008 JO, No. 5-01, which determined that the pre-existing crushing operation did not constitute a "substantial change" and did not require an Act 250 permit. The District Coordinator made additional jurisdictional determinations in 2010 and 2012 concluding that rock crushing operations on the ROA site did not constitute a substantial change to a pre-existing development and that therefore the associated rock crusher did not require an Act 250 permit.

On April 11, 2012, Applicants filed an Act 250 application with the District 5 Environmental Commission (Commission) to operate a 180 ton/hour hot mix asphalt plant on the Rock of Ages property. On January 24, 2013, the Commission approved the application and issued the permit. This permit was later modified by a February 26, 2013 decision on motions to alter. In re: North East Materials Group, LLC, No. 5W0966-6 (altered), Land Use Permit (Dist. 5 Envtl. Comm'n, Feb. 26, 2013). Appellants appealed the issuance of that land use permit to this Court; that appeal is currently a separate case, to be decided independently. In re North East Materials Grp. Am. Act 250 Permit, No. 35-3-13 Vtec. The only matter at issue here is Appellants' appeal of the September 28, 2012 JO finding that Applicants' rock crushing operation is not subject to Act 250 review.

On December 3 and 4, 2013, the Court held a two-day merits hearing at the Vermont Superior Court, Environmental Division in Berlin, Vermont. The Court attempted a site visit on December 3, 2013, however, due to weather and poor visibility the site visit was postponed. At the conclusion of the merits hearing on the afternoon of December 4, 2013, the Court conducted the site visit pursuant to the parties' Stipulated Site Visit Itinerary. Appearing at the site visit and merits hearing were Attorneys Alan P. Biederman and James Goss, representing the Applicants, and Attorneys Christopher Ahlers and Douglas Ruley, representing the Appellants.[3] Attorney Gregory Boulbol, representing the Natural Resources Board, attended the trial but did not actively participate. Attorney Boulbol did not attend the site visit.

Marc and Lori Bernier, two of the Appellants, appeared at the beginning of trial as self-represented litigants for the limited purpose of being heard on a motion to postpone the trial.

---

[3] Appellants also filed a request to allow the appearance of Mr. Brett Dugan, a Vermont Law School student, on their behalf. Because Mr. Dugan could not obtain written consent of all Appellants as required by § 13 of the Rules of Admission to the Bar of the Vermont Supreme Court, he did not take an active role before the Court.

Due to a provision within their residential property deed, the Berniers raised property rights concerns and moved that the Environmental Division trial be postponed to provide time for a civil action to be commenced and decided. We denied the Berniers' motion. Thereafter, and for the remainder of trial, Attorneys Ahlers and Ruley represented the Berniers along with the other Appellants.

Appellants' Questions 1–4 and 6–9 ask whether ROA's and NEMG's crushing activities are a pre-existing development, whether any pre-existing development has been abandoned, and whether any pre-existing development has undergone a substantial change.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact.

**Findings of Fact**

1. The Rock of Ages Corporation is a quarrying operation comprised of several smaller individual quarries active from the late 1800s to current times, now all aggregated as a single parcel under the Rock of Ages Corporation ownership and operation.

2. All total, ROA comprises approximately 930 acres in Barre, Vermont and 230 acres in Williamstown, Vermont.

3. Some of the historic individual quarries were previously owned and operated by the Boutwell, Milne & Varnum Corporation, the E.L. Smith & Company, the Wetmore & Morse Granite Company, and the Wells-Lamson Quarry Company.

4. These quarries are adjacent to one another and are aligned in a more or less north – south configuration.

5. Several roads transect the ROA property, including Graniteville Road. Roads also connect work areas throughout the ROA property.

6. Three sites, including the "Smith" quarry and the former Wells-Lamson crusher site, are located north of Graniteville Road. Two quarrying sites, including the "Adams" quarry, are located south of Graniteville Road, as is the NEMG crushing operation at issue here.

7. Granite quarrying is a process of cutting and extracting large blocks of stone for sale or to be further processed into monuments or other industrial products and then sold. The large blocks of granite suitable for monuments and similar uses are referred to as "dimension stone."

3

8. Quarrying activity moves deeper into the earth over time. Typically, higher quality material is found the deeper one mines a quarry.

9. The depth of a quarry is limited by the ability of derricks to lift the blocks out of the quarry or by the horizontal acreage available to build roads down into the quarry.

10. At the inception of a quarry, the overburden soil and rock is removed to expose the underlying granite. The granite closest to the surface is called "bedding" and is typically unsuitable for sale or use as dimension stone. It is typical for ROA to need to remove 80 to 200 feet of bedding to reach suitable dimension stone. Removal of overburden soil and bedding is referred to as quarry "development." Development is expensive and produces considerable volumes of soil and stone which is either trucked off-site or piled on-site.

11. This overburden is waste material unless the rock component is crushed into usable and salable product. Up to 80 percent of quarry material is waste.

12. "Grout" is waste granite which is not suitable for the high-end dimension stone.

13. Crushing makes use of the waste from development material, including grout, by reducing the material to usable and salable sizes.

14. Much of the material in modern day grout piles is typically too large for crushing.

15. The crushing process is common at dimension quarries in order to utilize the otherwise waste material.

16. Crushing rock at various locations is customary in the industry because the equipment is often portable and the source of material may change.

17. Intermittent rock crushing is also customary based on waste material levels and demand for crushed rock.

18. Crushing entails drilling, blasting, removal, and transport of rock to the crusher equipment. While many of today's crushing operations use portable equipment, material is typically moved from the extraction area to the crusher.

19. Don Murray, ROA Engineer, has personal knowledge of crushing at ROA since the 1960s. Mr. Murray has completed significant research into crushing activities at ROA preceding 1960.

20. As early as 1904 there was a crushing plant in Barre installed by J.M. Boutwell at the Boutwell, Milne & Varnum Corporation quarry. This crushing plant utilized waste stone from the quarries.

21. Photographic evidence shows that crushing activity took place around 1912 near the current compressor building on the south side of Graniteville Road in close proximity to NEMG's crushing location. It was common at this time for crushed material to be placed in rail cars and transported off-site.

22. As far back as 1926, the former Wells-Lamson Quarry Company conducted crushing, including a crushing operation producing poultry grit and road aggregate. This crushing continued through the 1940s and into the 1960s. By 1948, this quarry and crusher had been conveyed to ROA.

23. Wells-Lamson rock crushing operations provided granite sub-base material for Interstate 89 in 1958 and 1959. This crushing operation ceased shortly after this time. This crushing operation had a capacity of 1,000 tons per day. Railcars were used to transport the crushed material. A railcar has a load capacity of approximately 100 tons of crushed rock. Hundreds of railcars of crushed rock were transported off-site for Interstate 89 development.

24. The Wells-Lamson rock crushing operations produced eight sizes of stone ranging from 300 pound individual pieces to fine dust, all for use in road building. The crushing equipment included 2 Hydrocone gyratory crushers, screening equipment, electric motors, and V-belt drivers.

25. Kelley Construction, Inc. contracted with ROA in August 1969 to remove overburden and rock in the Smith Quarry. Activities included the planned crushing of approximately 40,000 cubic yards of material for sale. This work was undertaken between September 1969 and April 1970.

26. In 1988, Cooley Asphalt Paving Corporation entered into a 10 year contract with ROA to remove and crush granite. Cooley had been performing this activity prior to 1988. Cooley removed and crushed an estimated 200,000 tons or more of granite during the contract period.

27. McCullough Crushing, Inc. was awarded an Air Pollution Control Permit in January 1990 from the Vermont Agency of Natural Resources for a portable crushed stone/gravel processing plant.

28. From July 1990 to November 1990 McCullough Crushing removed more than 55,000 tons of crushed granite from the Adams Quarry.

29. McCullough Crushing's equipment included a jaw crusher, a cone crusher, a conveyor, and a screen. This equipment is similar to NEMG's crushing equipment.

30. In 1992 and 1993, crusher material was hauled from three different areas at ROA property, including "the Adams quarry" south of the NEMG site, "the Notch," and "the Stockpile" near the area where NEMG is currently located. Pike Industries crushed this material at the Wells-Lamson quarry site north of ROA property.

31. During the 1990s, McCullough's crushing took place in a similar area to NEMG's current location. This activity included similar truck traffic.

32. The E.L. Smith & Company quarry included crushing activity from 2005 to 2007. The E.L. Smith & Company quarry is located approximately 0.8 miles to the north of NEMG operations.

33. NEMG entered into a contract with ROA to crush waste rock on-site into salable material.

34. The rock crusher at issue, operated by NEMG between the Smith and Adam quarries, began operating in 2009 after the District 5 Environmental Commission Coordinator determined, in a December 17, 2008 JO, No. 5-01, that the proposed crushing operation did not require an Act 250 permit.

35. The District Coordinator issued additional jurisdictional opinions in 2010 and 2012 finding that rock crushing operations adjacent to the Smith Quarry at Rock of Ages did not constitute a substantial change to a pre-existing development and that the associated rock crusher therefore did not require an Act 250 permit.

36. NEMG crushed 20,285 tons of material in 2010; 155,577 tons in 2011; 89,667 tons in 2012; and 59,279 tons in 2013. The spike in crushing in 2011 was due to Tropical Storm Irene when the Vermont Natural Resources Board suspended Act 250 permitting needs for gravel and

6

quarry operators due to the increased need for road-building material in order to rebuild infrastructure destroyed in the storm.

37. NEMG's crushing activity is intermittent. NEMG crushes when material is needed. Crushing typically does not take place during the winter months.

38. In 2011, NEMG crushed on 53 days. In 2012, NEMG crushed on 83 days, and in 2013, NEMG crushed on 43 days.

39. NEMG's crushing operations have moved around the ROA property over this time.

40. NEMG's current crushing operations include crushing and screening. The equipment includes two jaw crushers, a cone crusher, a triple-deck screen, loaders, and excavators.

41. The primary crusher breaks large material into smaller pieces that fit into the jaw crusher. The primary crusher is a hydraulic hammer.

42. There have been machinery improvements over time since the first crusher at the Boutwell quarry in the early 1900s; however, the process of crushing remains the same. A large primary crusher crushes rock followed by a smaller crusher further reducing rock size. Screens are used to separate the crushed rock by size suitable for various purposes.

43. NEMG does not own delivery trucks. Material is transported off-site by customers using their own trucks. NEMG does own one truck that hauls grout.

44. On June 5, 2013, ANR issued an Air Pollution Control Permit to Construct to NEMG for installation of crushing, screening, and conveying equipment. The ANR permit allows two primary crushers, two secondary crushers, three screening decks, discharge and stacking conveyors, and a diesel powered electric generator.

45. Neighbors in the area of crushing experience noise, dust, and traffic. Common noises are material being loaded or unloaded. Dust accumulates on house windows, outside furniture, lawns, and cars. When traveling on area roads, it is common to encounter dump trucks on Graniteville Road traveling to or from the crushing activity.

46. Dimension stone is typically transported on flatbed tractor trailer trucks. Crushed material, also called aggregate, is typically transported in dump trucks. ROA's dimension stone operations also use dump trucks.

47. ROA's dimension stone quarrying activities also create noise, dust, and truck traffic.

7

**Conclusions of Law**

Act 250, 10 V.S.A. §§ 6001 through 6093, was enacted over forty years ago "to protect Vermont's lands and environment by requiring statewide review of 'large-scale changes in land utilization.'" In re Audet, 2004 VT 30, ¶ 13, 176 Vt. 617 (mem.) (quoting Comm. to Save Bishop's House, Inc. v. Med. Ctr. Hosp. of Vt., Inc., 137 Vt. 142, 151 (1979)). A party proposing land "development" must obtain an Act 250 permit. 10 V.S.A. § 6081(a). "Development" is defined as one or more of 10 listed activities, including the construction of improvements for commercial or industrial purposes on a tract or tracts of land involving more than 10 acres in a municipality that has adopted permanent zoning and subdivision regulations or 1 acre in a municipality that has not. 10 V.S.A. § 6001(3)(A)(i)–(ii). Act 250 Rule (2)(C)(3) defines "construction of improvements" as "any physical action on a project site which initiates development," subject to certain enumerated exceptions. Natural Resources Board Act 250 Rules, Rule 2(C)(3), Code of Vt. Rules 16-5-200:2(C)(3) (WL) (2009).[4]

Any development that was commenced before June 1, 1970 is a "pre-existing development" and is exempt from the permit requirement. Id. at 2(C)(8); 10 V.S.A. § 6081(b). A permit is required, however, for any "substantial change" to a pre-existing development, defined as "any change in a pre-existing development or subdivision which may result in a significant adverse impact with respect to any of the [10 Act 250 criteria]." Code of Vt. Rules 16-5-200:2(C)(7) (WL) (2009); 10 V.S.A. § 6081(b).

**Burden of Proof**

The party claiming the pre-existing development exemption (10 V.S.A. § 6081(b)) has the burden of proving that the development existed prior to June 1, 1970 and that it was not abandoned. In re Big Rock Gravel, LLC Act 250 Jurisdictional Opinion, No. 174-8-08 Vtec, slip op. at 7–8 (Vt. Super. Ct. Envtl. Div. Oct. 19, 2010) (Wright, J.). Once a development is determined to fall within the exemption for pre-existing development, "the burden shifts to the proponents of jurisdiction to demonstrate that a project represents a substantial change to the pre-existing development." In re Vermont RSA Ltd. P'ship, 2007 VT 23, ¶ 10, 181 Vt. 589 (citation omitted). The party seeking an exemption, however, retains the burden of producing

---

[4] Rule 2(C)(3) was amended in 2013. Code of Vt. Rules 16-5-200:2(C)(3) (WL) (2013). Because the JO was requested in 2012, the 2009 language applies here.

sufficient information on the pre-1970 operation for the Court to determine whether a substantial change exists. Re: Hale Mountain Fish and Game Club, Inc., No. 435, Findings of Fact, Conclusions of Law, and Order, at 14 (Vt. Envtl. Bd. Aug. 4, 2005). Lastly, "[t]here is no presumption that a substantial change either has or has not occurred since the enactment of Act 250." Re: Vermont RSA Ltd. P'ship, No. 441, Findings of Fact, Conclusions of Law, and Order, at 7 (Vt. Envtl. Bd. Oct. 20, 2005), aff'd, 2007 VT 23, 181 Vt. 589.

### Pre-existing Development

Appellants' Questions 1 and 2 ask the following:

Whether there was a "pre-existing development" involving a crusher on property owned by Rock of Ages as of the effective date of Act 250 (June 1, 1970), within the meaning of 10 V.S.A. § 6081(b) and Act 250 Rule 2(C)(8)?

Whether any quarrying operations on Rock of Ages property prior to June 1, 1970 constitute a "pre-existing development," within the meaning of 10 V.S.A. § 6081(b) and Act 250 Rule 2(C)(8), if there was no rock crushing being performed?

"Pre-existing development" is defined to include "any development in existence on June 1, 1970 and any development which was commenced before June 1, 1970 and completed by March 1, 1971." Act 250 Rule 2(C)(8), Code of Vt. Rules 16-5-200:2(C)(8) (WL) (2009). Development built before June 1, 1970 is a "pre-existing development" and is thereby exempt from Act 250 jurisdiction absent a substantial change. Vermont RSA Ltd. P'ship, 2007 VT 23, ¶ 8 (citing 10 V.S.A. § 6081(b)).

Our findings, based upon the credible evidence before the Court, demonstrate significant pre-1970 dimension stone quarry operations throughout the ROA property. Specifically, starting in the 1800s and continuing to today, granite has been quarried through a process of cutting and removing large blocks of dimension stone for sale or further processing. The quarry encompasses more than 1,100 acres. The development of quarries that provide dimension stone creates large quantities of waste rock not suitable for sale as dimension stone. This waste is often either stored on site or crushed into usable and salable gravel products. Crushing operations reduce the volume of waste material and help to recover the cost of developing a quarry.

Appellants assert that the rock crushing at issue is separate and distinct from other quarrying activities. We disagree. The evidence shows that the dimension stone quarrying now

9

under ROA ownership included rock crushing operations as early as 1904 and has included intermittent crushing operations at various locations within ROA through to present times. While crushing may be a particular component of ROA operations, we find that it is not a separate stand-alone development. Moreover, although evidence of rock crushing at the northernmost quarry (beyond ROA property lines) does not itself indicate ROA's pre-existing development, it supports our finding that there was and continues to be a relationship between quarrying dimension stone and rock crushing. Appellants' argument that crushing is merely desirable but not integral to quarrying dimension stone does not alter this conclusion. The facts establish that rock crushing has been a part of dimension stone quarrying at ROA since at least 1904 and it remains a part of such quarrying today. We therefore conclude that the ROA quarry operations, including crushing activities, are a pre-existing development within the meaning of 10 V.S.A. § 6081(b) and Act 250 Rule 2(C)(8).

**Pre-existing Exemption Effective Between Entities**

Appellants' Question 3 asks the following:

Whether any pre-1970 operation of crushers by legal entities other than Rock of Ages and NEMG constitutes a "pre-existing development," within the meaning of 10 V.S.A. § 6081(b) and Act 250 Rule 2(C)(8), upon which Rock of Ages or NEMG may assert an exemption from jurisdiction?

"Act 250 speaks to land use and not the particular institutional activity associated with that land use . . . ." In re Baptist Fellowship of Randolph, Inc., 144 Vt. 636, 639 (1984). Furthermore, Act 250 permitting decisions attach to and run with the land itself irrespective of changes in ownership. In re Estate of Swinington, 169 Vt. 583, 585 (1999) ("[L]and use permits 'run with the land' rather than exist as licenses personal to the licensees."); Act 250 Rule 33(C)(3), Code of Vt. Rules 16-5-200:33 (WL) (2009). From the 1800s to present times, fee interests in the land at issue in this appeal were conveyed from one legal entity to another. Presently, ROA holds all relevant fee interests. Furthermore, at various times, legal entities without a fee interest in the quarry have carried out crushing activities by contracting with the fee owner. These facts do not alter the status of any pre-existing development exemption from Act 250 jurisdiction attaching to and running with ROA's land. We therefore conclude that ROA quarrying and associated crushing is a pre-existing development even though ROA acquired its

10

interest in the quarry over time and at times contracted with independent legal entities to undertake crushing.

**Tract of Land**

Appellants' Question 4 asks the following:

Whether a "pre-existing development" on one tract of land may form a basis for an exemption from Act 250 jurisdiction under 10 V.S.A. § 6081(b) and Act 250 Rule 2(C)(8) for another tract of land, without a consideration of surrounding land uses.

Today, ROA is a dimension stone quarry on a single parcel comprising more than 1,100 acres. The quarry is composed of several historic smaller quarries adjacent to one another. The several historic quarries were all active prior to June 1, 1970, and many were conveyed to ROA prior to June 1970. Based upon our findings, crushing took place at several locations within ROA as early as 1904 and continued through June 1, 1970. The overall nature of the pre-existing development in this appeal is an expansive dimension stone quarry which includes intermittent crushing. The nature of this pre-existing development has not changed over time.

Appellants argue that because the smaller quarries are separated by public roads and distances of up to several miles they are distinct developments and therefore crushing on one does not establish crushing on another. See Re: Thomas Howrigan Gravel Extraction, No. 358, Findings of Fact, Conclusions of Law, and Order, at 14 (Vt. Envtl. Bd. Aug. 30, 1999); Re: Robert and Barbara Barlow, No. 234, Findings of Fact, Conclusions of Law, and Order, at 8–9 (Vt. Envtl. Bd. Sept. 20, 1991), aff'd, In re Barlow, 160 Vt. 513 (1993). We are directed to give prior decisions of the Environmental Board the same weight and consideration as prior decisions of the Environmental Division. 10 V.S.A. § 8504(m). These Board decisions generally involve expansion of a gravel extraction operation. This case presents facts distinguishable from a gravel pit expanding from one extraction area to another area along the same gravel vein, with one area having been excavated prior to June 1, 1970 and the other afterward.

It is undisputed that dimension stone quarrying took place at all of ROA's quarry sites prior to 1970. We also find that over the last 100 years, various entities have crushed rock on a regular but intermittent basis at several locations within the ROA parcel. Today, the ROA land is contiguous. Historically, crushing operations at ROA have moved from one area to another

11

depending on the source material to be crushed. In the early 1900s, crushing took place at the Boutwell quarry, near the current NEMG site. NEMG's "moveable/portable" rock crushing equipment is located near two ROA working quarries. Thus, because crushing is, and always has been, a part of dimension stone quarrying at the quarries now under contiguous ownership by ROA, the Environmental Board's decisions regarding gravel extraction expansion are not relevant. We therefore view the pre-existing development at ROA as one operation and will not distinguish between different "tracts" based on intervening public roads.

### Abandoned

Appellants' Question 6 asks the following:

Whether any crushing operations forming the basis for any "pre-existing development" have been legally abandoned, precluding an exemption from Act 250 jurisdiction.

To qualify for exemption as a pre-existing development, ROA must establish that its dimension stone quarrying and crushing operations have not been abandoned. Re: U.S. Quarried Slate Prods., Inc., Nos. 279 and 283, Findings of Fact, Conclusions of Law, and Order (Reconsidered), at 22 (Vt. Envtl. Bd. Oct. 1, 1993) (concluding that a 20–30 year lapse in use of a quarry pit constitutes abandonment). Industry cycles and custom, especially seasonal operation, can be relevant in determining whether a project has been abandoned. Id. at 23.

The evidence clearly shows that the pre-existing dimension stone quarry has not been abandoned. Furthermore, the evidence shows over 100 years of fairly consistent but intermittent crushing activity at the ROA quarry. Crushing rock at various locations is customary in the industry because the equipment is often portable and the source of material may change. Intermittent rock crushing is also customary based on waste material levels and demand for crushed rock. Thus, we conclude that ROA's pre-existing development, including crushing, has not been abandoned.

### Substantial Change

Appellants' Question 7 asks the following:

Whether any of the following constitutes a "substantial change" to a "pre-existing development," within the meaning of 10 V.S.A. § 6081(b), Act 250 Rule 2(A), and Act 250 Rule 2(C)(7):

a. The use of or addition of crushers by Rock of Ages or NEMG to supply aggregate to the proposed asphalt plant,

b. NEMG's admission in its Act 250 application that "large quantities of aggregate" will be generated on site for the proposed asphalt plant,

c. NEMG's authorization to crush rock in amounts up to 175,000 tons per year, by virtue of an air permit granted by the Agency of Natural Resources on July 5, 2012, or

d. Any other activities of Rock of Ages or NEMG or other legal entities, since 1970.

A development may be an exempt pre-existing development and may continue operating without a permit unless there is a substantial change to that pre-existing development. Vermont RSA Ltd. P'ship, 2007 VT 23, ¶¶ 9–10. Thus, a substantial change to a pre-existing development requires an Act 250 permit. Big Rock Gravel, LLC, Act 250 Jurisdictional Opinion, No. 174-8-08 Vtec, slip op. at 7 (Vt. Super. Ct. Envtl. Div. Oct. 19, 2010) (Wright, J.). A "substantial change" is defined as "any change in a pre-existing development or subdivision which may result in a significant adverse impact with respect to any of the [ten Act 250] criteria." Natural Resources Board Act 250 Rules, Rule 2(C)(7), Code of Vt. Rules 16-5-200:2 (WL) (2009); In re Hale Mountain Fish and Game Club, Inc., 2007 VT 102, ¶ 4, 182 Vt. 606 (recognizing that the former Environmental Board Rule 2(G) which is nearly identical to Rule 2(C)(7) has effectively become part of the Act 250 process). The Environmental Board established a two-prong test for determining whether there has been a substantial change, and the Vermont Supreme Court has "repeatedly upheld" that test. Vermont RSA Ltd. P'ship, 2007 VT 23, ¶ 10.

**Two-Part Test**

Under the two-prong substantial change test, we first determine whether a cognizable physical change to the pre-existing development will result from the project. Then, if there is a cognizable physical change, we consider whether the project has the potential for significant adverse impact under one or more of the 10 Act 250 criteria. Id.

i. Congnizable physical change

Appellants' Question 8 asks the following:

Whether any of these activities have created or could create a cognizable physical change to any "pre-existing development."

13

To determine whether a cognizable physical change has occurred, we must examine whether the quarry is being "operated in essentially the same manner as it was before June 1, 1970." F.W. Whitcomb Constr. Co., No. 408, Findings of Fact, Conclusions of Law, and Order, at 10 (Vt. Envtl. Bd. Dec. 19, 2002) (internal quotation omitted); Re: John Gross Sand and Gravel, No. 280 (Supplementary), Findings of Fact, Conclusions of Law, and Order, at 9 (Vt. Envtl. Bd. July 28, 1994) (expansion of an extraction area in a gravel/sand pit operation was not cognizable change).  As noted above, Appellants have the burden of establishing a substantial change to the pre-existing development. Vermont RSA Ltd. P'ship, 2007 VT 23, ¶ 10.

Since the early 1900s, crushing has been a regular but intermittent activity at the various ROA quarry sites.  In the late 1950s, crushing operations supplied crushed granite to build Interstate 89.  This crushed material was transported off-site in 100-ton capacity rail cars.  Testimony and documentary evidence shows that hundreds of rail cars carried crushed material off-site during this period.  Although technologically improved, the crushing equipment remains essentially the same, with a large primary crusher crushing rock, followed by a smaller crusher further reducing rock size.  Screens are used to separate crushed rock into different sizes.

From September 1969 to April 1970, Kelly Construction, Inc. contracted with ROA to remove and crush 40,000 cubic yards of material.  This is equivalent to an annual crushing rate of 60,000 cubic yards. [5]  The evidence supports a similar annual crushing rate through the 1980s and 1990s by Cooley, McCullough, and Pike.

NEMG crushed 20,285 tons of material in 2010; 155,577 tons in 2011; 89,667 tons in 2012; and 59,279 tons in 2013.  The spike in crushing in 2011 was due to Tropical Storm Irene when a large quantity of road building material was needed to rebuild infrastructure damaged from the storm.  The Vermont Natural Resources Board suspended enforcement of extraction limits and trucking activities during this period of increased need for materials.  NEMG's authorization to crush rock in amounts up to 175,000 tons per year, by virtue of an air permit granted by the Vermont Agency of Natural Resources on July 5, 2012, does not demonstrate an increase in NEMG's actual crushing rate.  While the air permit limits NEMG's crushing, it does

---

[5] Assuming one cubic yard of crushed granite weighs somewhere between 1.5 and 2.5 tons, this annual crushing rate is similar to the annual crushing rate for the quarry during the 1980s, 1990s, and NEMG's normal annual crushing rate.

not serve as credible evidence that NEMG actually crushes or plans to crush that quantity of rock.

Crushing is a small but integral part of the ROA dimension stone quarry. Because the location of crushing operations has moved around ROA's 1,100-acre site since the early 1900s, we conclude that it is reasonable to expect that the location of crushing will vary over time.

While the Environmental Board and this Court have closely reviewed pre-1970 annual extraction rates to define the extent to which a gravel extraction operation can continue to operate and expand, that analysis does not readily apply to this case. Here, as mentioned above, the pre-existing development is a more than 1,100-acre dimension stone granite quarry which includes intermittent and portable rock crushing activities. Thus, so long as the operation of ROA is essentially the same as it was pre-1970, no Act 250 Permit is required. In considering crushing activities at ROA, the evidence shows significant crushing prior to 1970. Through the 1940s, 1950s and 1960, the crushing capacity was 1,000 tons of material crushed per day with railcar load capacities of approximately 100 tons per car. The evidence further shows hundreds of railcars transporting crushed rock during this period. After construction of Interstate 89 was complete in the 1960s, crushing rates decreased. While the parties did not provide detailed evidence of crushing rates just prior to 1970 to current times, the evidence does demonstrate that crushing has continued at a similar magnitude prior to and after 1970.

Appellants have failed to meet their burden of demonstrating that NEMG's crushing represents a cognizable physical change to ROA's pre-existing development. We therefore conclude that NEMG's crushing is not a cognizable change to ROA's pre-existing development. We do note that on-site use of crushed material, such as a proposed asphalt plant operation, is not before us in this matter. Such activity is for consideration in the separate, but related, matter and will be independently reviewed and decided.

ii. Potential for Significant impact

Consideration of the second element—the potential for significant impact with respect to Act 250 criteria—is unnecessary because the pre-existing development has not undergone a cognizable change. We recognize that Appellants allege that NEMG's rock crushing creates various impacts, including noise, particulate matter in the form of stone dust, and truck traffic

and congestion, and that these impacts cause them to assert the need for an Act 250 permit. We note that these impacts are, however, within the range of impacts to be expected from the extraction, movement, and crushing of overburden which is necessarily removed as part of quarry development. There has been no cognizable change to these pre-existing activities. Without a finding of a cognizable change, we do not have jurisdiction to review these alleged impacts.

### Conclusion

For the reasons discussed above, we conclude that the ROA quarry operations, including intermittent and portable crushing activities, are a pre-existing development within the meaning of 10 V.S.A. § 6081(b) and Act 250 Rule 2(C)(8); that ROA quarrying and crushing is a pre-existing development even though it has acquired its interest in land over time and at times has contracted with independent legal entities to undertake crushing at different locations within its dimension stone quarry; and that no intervening ownership, if any is in fact present, is relevant to the determination of the extent of the pre-existing development. We also conclude that Appellees' crushing activities have not been abandoned. Lastly, we conclude that Appellees' pre-existing development has not undergone a substantial change. For these reasons, Appellees' do not require an Act 250 permit to crush rock at the NEMG crusher site at levels customarily associated with ROA's operation.

A Judgment Order accompanies this Decision. This completes the current proceedings before this Court.


Electronically signed on April 28, 2014 at 04:16 PM pursuant to V.R.E.F. 7(d).

_Tom Walsh_

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division

16