**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

| | | |
|---|---|---|
| | } | |
| **In re: Snopeck & Telscher** | } | Docket No. 269-12-07 Vtec |
| **Appeal of Act 250 Jurisdictional Opinion** | } | |
| | } | |

**Revised Decision on Motion for Summary Judgment[1]**

Appellants Margaret Telscher and Thomas Snopeck ("Appellants") appeal a jurisdictional determination rendered by the District Coordinator of the District 2 Environmental Commission in which the Coordinator concluded that there was Act 250 jurisdiction over demolition and construction proposed on Appellants' parcel of land, which is located above 2,500 feet in the Town of Stratton. Appellants are represented by A. Jay Kenlan, Esq. and David R. Cooper, Esq.; no other party has chosen to participate in this proceeding.[2]

Appellants moved for summary judgment on Question 1 from their Statement of Questions, which generally asks whether the completed demolition of a pre-existing house and the proposed construction of a new house on Appellant's property triggers Act 250 jurisdiction. As Appellants are the only party to enter an appearance, Appellants' motion is unopposed.

**Factual Background**

1.	Appellants own a 1.26 acre parcel of land located on West Ridge Road in the Town of Stratton. The entire lot is located above 2,500 feet in elevation, below a prominent ridge-line. At the time Appellants acquired the parcel in 2001, a six-bedroom single-family residence and a detached two-car garage were located on the property. The existing residence was 5,245 square feet in size; the existing garage was approximately 820 square feet in size. The house was constructed prior to 1969; the lot upon which the house is located was subdivided prior to that date. Thus the initial development was not subject to Act 250 jurisdiction.[3]

---

[1] This Decision was originally issued on June 26, 2008. It has been revised, most substantially on pages 8–11, as a consequence of the Court seeing the merit of Appellant's motion to alter, filed on July 10, 2008.

[2] Attorneys for the Vermont Natural Resources Board and the Agency of Natural Resources have requested that the Court and the parties keep them advised as to the status of the appeal, but have advised that their respective clients have chosen not to participate in this appeal.

[3] Act 250 was enacted as of June 1, 1970.

2. Over the years, the existing house deteriorated and Appellants sought to perform substantial repairs and improvements. Appellants assert that the existing house was not properly insulated, had begun to have a mold problem and that as a full-time residence, it did not provide enough room in which to store their belongings. Thereafter, Appellants sought to demolish the existing house and construct a new, larger house on the lot.

3. Appellants were also advised by their engineer that the existing wastewater disposal system on the lot had an indeterminate life expectancy. Because the Winhall-Stratton Fire District ("Fire District")[4] sewer line was about 1,700 feet down-slope from Appellants' lot and accessible via a right-of-way, Appellants sought approval to connect their new house to the sewer line.

4. In order to decommission the existing wastewater disposal system and to connect the proposed house to the sewer line, Appellants were required to obtain a wastewater disposal permit ("WW Permit") from the Wastewater Management Division of the Vermont Agency of Natural Resources, Department of Environmental Conservation ("DEC").

5. Appellants retained an engineer to design a sewer line from their lot to the Fire District sewer line and to apply for a WW Permit. During this process, Mr. and Mrs. Pessin, who owned a nearby property on West Ridge Road, became interested in connecting their home to the sewer line to be constructed by Appellants. Appellants agreed to have the Pessins as co-applicants on the WW Permit application and to allow the Pessins to connect to the sewer line connection.

6. Appellants' engineer submitted a series of engineering and site location drawings with their WW Permit application. Several of the drawings depict the new water supply well, the replacement wastewater disposal system, the footprint of the existing house, the approximate location of the proposed house and the 2,500 foot elevation contour line. Appellants contend that the series of engineered drawings clearly depict that the entire lot is above 2,500 feet. However, in response to paragraph 28 on the WW Permit application, which asks whether "there is any prior Act 250 jurisdiction on the tract of land," no response was provided. Appellants provided a copy of the application as Exhibit S-1.

7. As is the common practice in the state office building shared by the DEC and the District 2 Environmental Commission ("District Commission"), the District Coordinator reviewed

---

[4] Many Vermont municipal sewer treatment systems are owned, maintained and administered by a municipal entity known as a fire district, for reasons that this writer has long since forgotten.

Appellant's WW Permit application and site plans once they were submitted to the DEC. In August of 2007, the District Coordinator prepared, signed and issued a Project Review Sheet[5] in reference to Appellants' proposed redevelopment plans. The signed Project Review Sheet included the notation "need more information—length of sewer line extension, any possibility for other connections?" Appellants provided a copy of the Project Review Sheet as Exhibit S-8.

8. In early October of 2007, Appellants' engineer responded to the District Coordinator's notation on the Project Review Sheet, and also re-submitted plans that, upon examination, show that Appellants' property is above 2,500 feet in elevation. The District Coordinator did not make further inquiry of Appellants or their engineer.

9. On October 15, the District Coordinator supplemented her Project Review Sheet via e-mail correspondence in which she replied to Appellants' engineer by stating that "based upon your representation that the sewer line will serve the existing subdivision and not service other lands along the route or adjacent to the subdivision, it is my opinion that an Act 250 permit is not required." Appellants provided a copy of the District Coordinator's e-mail supplement as Exhibit S-10.

10. Immediately following the October 15th jurisdictional determination, Appellants demolished the existing house on the property in preparation for the construction of the proposed new house.

11. Like the demolished house, the proposed house is designed to contain six bedrooms. However, the proposed house will contain approximately 12,370 square feet of floor space, which is more than 7,125 square feet larger than the demolished house. Appellants also demolished the existing garage, and propose to construct a garage that will be approximately 1,430 square feet in size, as compared to the former garage of 820 square feet. Appellants contend that the proposed house will be architecturally designed to meet or exceed current energy efficiency codes; will be painted a muted brown color; the windows will be installed under overhangs; and the exterior lighting will be shielded, low-voltage down-lighting. Thus,

---

[5] The Court understands project review sheets to be a form used by district coordinators to advise property owners and others when an Act 250 or other state permit may be needed for a proposed project. Project review sheet forms contain a paragraph, in bold and capitalized type, giving notice that it constitutes a jurisdictional opinion from which an appeal may be taken to this Court. See Appellant Exhibit S-8.

The common practice of district commissioners, as the Court understands, is to reference on a project review sheet that facts as represented by the requesting party, and to not conduct an independent investigation or formal hearing on the project. No formal application form is used in connection with project review sheet requests.

Appellants assert that the proposed house, albeit larger, will have less deleterious impacts upon the surrounding environment than the demolished house.

12.     Appellants received approval for the proposed house under the "Stratton architectural review covenants" on November 26, 2006; Major Project Approval by the Stratton Planning Commission on January 3, 2007; Zoning Permit approval from the Town of Stratton on February 6, 2008 (Permit # 0301022.2.2A); variance approval from the Town of Stratton Zoning Board of Adjustment on January 22, 2008 for a thirteen foot variance on the east side of the project; and a WW Permit from the DEC on September 24, 2007 (Permit # WW-2-2756). Appellants provided copies of the aforementioned permits as Exhibits 4, 5, 6, 7, and 9, respectively. The Court is not aware of any pending appeals from these aforementioned permit approvals.

13.     On November 7, 2007, the District Coordinator received a communication from an individual member of the Stratton Planning Commission.[6] This person informed the District Coordinator that Appellants' property was above 2,500 feet and questioned whether Act 250 jurisdiction would apply. Appellants provided a copy of the communication as Exhibit 2.

14.     On November 8, 2007, by email, the District Coordinator issued a further supplement of her jurisdictional determination to Appellants. In pertinent part, the Coordinator's November 8th e-mail read as follows:

> [A]ny construction and that includes demolition over 2,500 feet requires a permit. If you had told me that the elevation was over 2,500 feet for any of the work, the answer would be yes. Work must not proceed until and unless a permit is obtained.

Appellants provided a copy of the November 8th jurisdictional determination as Exhibit S-11.

15.     Thereafter, Appellant appealed the District Coordinator's jurisdictional determinations to this Court.

## Discussion

The legal issue now before the Court is a relatively narrow one: whether Act 250 jurisdiction attaches to certain re-development or re-construction activity on a previously-developed lot, located over 2,500 feet in elevation. By their pending motion, Appellants assert

---

[6]  In their Question 2, Appellants challenge the authority of this person to request an opinion on the jurisdictional implications of the project's elevation, as well as the District Coordinator's authority to act upon this person's request, but have declined to present that legal question for our analysis in their pending summary judgment motion.

that it is appropriate for this Court to summarily enter judgment in their favor on Question 1 from their Statement of Questions. No opposition has been filed to the motion.

Appellants' Question 1 poses the following legal issue:

> Do the demolition and removal of the Old House on Appellants' property . . . and the construction of the New House and installation of the replacement well and water systems and wastewater disposal system on Appellants' property . . . [which is] above 2,500' in elevation constitute a 'substantial change to a pre-existing development?'

As Appellants correctly note, summary judgment is appropriate only "when there are no genuine issues of material fact and, viewing the evidence in a light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." In re Carter, 2004 VT 21, ¶ 6 (citation omitted); V.R.C.P. 56(c). No other party has appeared in this proceeding and no party has filed an objection to Appellants' pending motion. Nonetheless, we must review the material facts in light of the applicable law and may only grant Appellants' motion if we determine that the applicable law directs that Appellants are entitled to judgment. In re Appeal of Jolley Associates, 2006 VT 132, ¶ 9, (quoting In re Garen, 174 Vt. 151, 156 (2002)). Where the applicable law clearly directs it, summary judgment "may be rendered against the moving party." V.R.C.P. 56(c)(3). We review the pending motion in this light.

In this appeal, Appellants assert essentially two bases for reversal of the District Coordinator's November 8th jurisdictional determination. First, Appellants contend that the demolition of the existing house, the installation of the replacement water system and the wastewater disposal system, and the construction of the proposed new house do not constitute a substantial change to a pre-existing development. Second, Appellants aver that the proposed new house will not result in any significantly greater impacts than the now-demolished old house with respect to any of the Act 250 criteria.[7]

We begin with the language of Act 250. The Act, by its terms, prohibits the commencement of "development without a permit", 10 V.S.A. § 6081(a), which includes the "construction of improvements for residential use above the elevation of 2,500 feet." 10 V.S.A. § 6001(3). Appellants correctly note that the permit requirement from § 6081(a) does not apply to development which has been in existence prior to June 1, 1970, as those pre-existing developments pre-date the implementation of the Act. 10 V.S.A. § 6081(b); Act 250 Rule

---

[7] The Act 250 criteria are set forth in 10 V.S.A. § 6086(a)(1)-(10).

2(C)(8)[8]. However, the permit exception from § 6081(b) only applies to the pre-existing development; any "substantial change" to a pre-existing development is not exempt. Id. Thus, Act 250 jurisdiction attaches to the substantial change of a development that was otherwise exempt under Act 250 Rule 2(C)(8).

We are therefore required to determine whether the material facts concerning Appellants' property and proposed improvements constitute a "substantial change." If a change to a pre-existing development is "substantial," it implicates Act 250 and is subject to the requirement that no development change be conducted until after an Act 250 land use permit is obtained. Act 250 Rule 34(B).

Under Act 250 Rule 2(C)(7), a "'[s]ubstantial change' means any change in a pre-existing development or subdivision which may result in significant impact with respect to any of the criteria specified in 10 V.S.A. § 6086(a)(1) through (a)(10)." Because the definition of "substantial change" includes any changes that may result in significant impacts, "the plain language of the rule does not limit Act 250 jurisdiction to changes that produce actual impact[s] on the statutory criteria." In re: Hale Mountain Fish and Game Club, Inc., 2007 VT 102, ¶ 4 (internal quotation and citation omitted). Thus, the District Coordinator, and this Court in a de novo appeal, "may find jurisdiction based on potential impacts as long as they are significant." Id. Further, the Supreme Court has affirmed a two-part inquiry to resolve whether an action constitutes a "substantial change." The two-part inquiry involves a determination as to "whether there has been a cognizable physical change to the preexisting development, and if so, whether the change has the potential for significant impact under one or more of the ten Act 250 criteria." Id.; see also Sec'y, Vt. Agency of Nat. Res. v. Earth Constr., Inc., 165 Vt. 160, 164 (1996); In re H.A. Manosh Corp., 147 Vt. 367, 369-70 (1986).

In this case, the first prong of the two-part inquiry is clearly satisfied for all the completed and proposed construction activity on the property. That is, the demolition of the pre-existing house and the construction of the proposed new house are undoubtedly cognizable changes to the pre-existing development. We cannot conceive of a different conclusion when the existing development is being wholly replaced with structures that are nearly double in size. The suggestion that the new structures will be more environmentally friendly and of less aesthetic

---

[8] Act 250 Rule 2(C)(8) defines "pre-existing development" as follows: (8) "Pre-existing development" means any development in existence on June 1, 1970 and any development which was commenced before June 1, 1970 and completed by March 1, 1971.

impact does not factor into this first part of our analysis.  Hale Mountain at ¶ 4, (quoting Sec'y, Vt. Agency of Nat. Res. v. Earth Constr., Inc., 165 Vt. 160, 164 (1996) and In re H.A. Manosh Corp., 147 Vt. 367, 369-70 (1986)).

We next look to whether these cognizable changes to the pre-existing development have the potential for significant impacts under any one of the Act 250 criteria.  Prior to analyzing the potential for significant impacts for the proposed work, it is important to note that considerable work has already been completed on the property: the existing house was demolished in the fall of 2007 without an Act 250 permit.  We are aware that Appellants have secured other permits authorizing their re-development; we are not aware of any other permits needed for their work to proceed, other than the permit issue being challenged in these proceedings.

**Demolished House**

Although the demolition of the existing house has already been completed, we must determine whether the demolition required an Act 250 permit and, if so, whether Appellants are now liable for obtaining a permit.  We will take each issue in turn.

First, it is important to note that demolition activities over 2,500 feet constitute development for the purposes of Act 250, because "any construction activity, no matter how minute, triggers Act 250 jurisdiction."  In re Audet, 2004 VT 30, ¶ 11, 176 Vt. 617, 619-20.  Also, pursuant to Act 250 Rule 2(C)(3), "'[c]onstruction of improvements' means any physical action on a project site which initiates development."  We therefore conclude that the demolition of the existing house comprises the initiation of development and therefore constitutes development for purposes of Act 250.

Because the demolition constitutes development, we return to the analysis of whether the demolition is a substantial change to a pre-existing development.  The first prong of the two-part inquiry is clearly satisfied:  the complete demolition of a 5,245 square-foot structure is undoubtedly a cognizable change to the project site.  Next, we look to whether the change has the potential to significantly impact upon one or more of the Act 250 criteria.

Generally, the Act 250 criteria ensure that a development will not result in undue water or air pollution; will not exacerbate the available water supplies; will not cause unreasonable soil erosion or affect the capacity of the land to hold water; will not affect the highways; will not burden the educational facilities or municipality; will not have an undue adverse effect on

7

aesthetics, scenic beauty, historic sites, or natural areas or habitat; and will conform to the local or regional plan. 10 V.S.A. § 6086(a)(1)-(10).

Here, several Act 250 criteria and sub-criteria may not be impacted by the demolition of the existing house. However, with the guidance of Hale Mountain, Earth Construction, and Manosh, we conclude that it is indisputable, even when we view the material facts in a light that is most favorable to Appellants here, that the demolition had the potential to significantly impact several Act 250 Criteria, including potentially significant impacts upon air and water quality, and the degree of soil erosion. These impacts were due, in part, to the precipitous ridge-line location of the lot. There is also the potential that an unregulated demolition could result in excessive dust, which may contain harmful components; could result in polluted water due to uncontrolled surface run-off; and could result in soil erosion due to the open ground and the close proximity to the steep ridge. Further, the demolition has the potential to adversely affect the scenic beauty of the area due to the site's prominent location near the ridge-line.

The demolition of the house, which is above 2,500 feet, has the potential to impact several Act 250 criteria and constitutes a substantial change to a pre-existing development. The demolition therefore required an Act 250 Land Use permit.

### Replacement Water System and Wastewater Disposal System

It is important to note that of the approximately 1,700 foot connection to the sewer line, only the top 50-100 feet are situated above 2,500 feet in elevation. On October 15th, 2007, the District Coordinator advised Appellants' engineer via e-mail that the sewer line connection did not require an Act 250 permit. From the materials supplied in connection with this jurisdictional request, it appears that the District Coordinator was more concerned about the effect that the sewer connection would have on scattered development and was not aware that the Appellants' project site was over 2,500 feet. Therefore, to the extent that her October 15th JO applied to the sewer connection below 2,500 feet, that opinion remains undisturbed, and that construction activity below 2,500 feet does not require a Land Use permit. However, for the 50-100 feet of the sewer connection that will be located above 2,500 feet, it is necessary to perform a two-prong analysis on whether the construction constitutes a substantial change to a pre-existing development.

8

Again, for the first prong, it is clear that the sewer connection and the replacement water system will result in a cognizable change to the property. Appellants will abandon their existing on-site wastewater and water supply systems and will connect to a municipal sewer system.

Moving to the next step of our analysis, we must determine whether the top 50-100 feet of the sewer line and the replacement water system will have the potential to significantly impact any of the Act 250 criteria. We conclude that we do not have sufficient facts before us to make this determination. As one example, we note that we have not been presented with any evidence of the potential impacts upon neighboring water quality and the available water supplies. Appellants have not indicated what their reclamation plan is for the existing on-site waste disposal system. If the on-site system indeed has an indeterminate life expectancy, it may also have an indeterminate ability to remain sealed and protective of the groundwater. Also, the replacement water system, which the Court assumes will require the drilling of a new well, has the potential to impact the available water supplies due to the high elevation and unknown availability of water supplies. Therefore, we conclude that we cannot grant summary judgment in Appellants' favor.

### Proposed House

Appellants aver that the proposed house—although several thousand square feet larger than the original house—will have either no significant impact, or a significant positive impact, on each Act 250 criteria. Appellants' contention is based on the architecture design for the proposed house that will purportedly mitigate the energy consumption, enhance the waste disposal, lessen the perceived visual impact and retain the established vegetation. When viewing the facts in a light most favorable to the Appellants, they concede that the proposed house will impact—albeit positively—several of the Act 250 criteria.

A careful review of the Act 250 statutes, the Act 250 Rules, and the case law construing them reveals that Vermont does not recognize Appellants' asserted distinction between positive and adverse impacts for the Act 250 criteria. Rather, for Act 250 jurisdiction, whether an action is a substantial change to a pre-existing development is determined by "potential impacts as long as they are significant." In re Hale Mountain, 2007 VT 102, ¶ 4 (internal citation omitted). Appellants concede that the proposed house will have the potential to significantly impact several Act 250 criteria, albeit in a positive fashion. If Appellants are correct, any Act 250 permit that they request for the new home may have the potential of being processed as a

9

"minor' application; if they are incorrect, any application they file may require a hearing. Act 250 Rule 51. Nonetheless, the undisputed facts lead us to conclude that the proposed house will constitute a substantial change to a pre-existing development and therefore will require an Act 250 permit.

We note that the proposed new house has the potential to negatively impact at least one Act 250 criterion. The substantially larger size of the proposed house, as compared to the former house, has the potential to be viewed more prominently from several areas in the Town of Stratton, which implicates Act 250 Criterion 8. Appellants presented a graphical representation of the perceived view of the proposed house. We are unable, particularly at the stage of reviewing a pre-trial motion, to determine its accuracy and reliability. But what appears indisputable is that the significantly larger size of the proposed home, even with its softer earth tones, has the potential to significantly impact at least Criterion 8.

While we appreciate Appellants' aspirations to increase energy efficiency and improve the aesthetic impacts of the proposed house, we note that the Act 250 permit application process ensures the added protection for evaluating new development on properties with elevations above 2,500 feet, precisely due to the vulnerability and prominence of such elevated and frequently steep areas. Thus, the permitting process is not to be subverted solely because of the alleged beneficial components of a project. If, in fact, the Appellants' proposed house improves the highlighted impacts, it will be for the District Commission to determine on review of their permit application.

Therefore, because we conclude that the proposed house will constitute a substantial change to a pre-existing development, it is under Act 250 jurisdiction and requires a Land Use permit.

## Conclusion

For all the reasons more fully discussed above, we **DENY** Appellants' motion for summary judgment pursuant to V.R.C.P. 56(c)(3) and, in doing so, we conclude that the demolition of the former house and the construction of the proposed new, substantially larger house constitutes a substantial change to a pre-existing development, thereby requiring an Act 250 Land Use permit. We cannot determine on the facts before us whether the construction of the replacement water system and the wastewater disposal system above 2,500 feet constitute a substantial change.

10

We recognize that our conclusions here only address the first of Appellants' three Questions from their Statement of Questions, filed on March 31, 2008. However, our conclusions are dispositive of the central issue in this appeal: that the substantial changes to Appellants' pre-existing development, located above 2,500 feet in elevation, trigger Act 250 jurisdiction.

Appellants advised the Court in their Motion to Alter our June 26th Decision that they now intend to pursue an Act 250 permit to allow their proposed redevelopment plans to proceed. We therefore decline to retain jurisdiction over the remaining Questions in this appeal, particularly in relation to the proposed water supply and wastewater disposal replacement systems, as it is more appropriate to allow the District 2 Environmental Commission to address those issues in the first instance.

The proceedings before this Court in this appeal are therefore concluded; a Judgment Order accompanies this Decision. Nothing in these proceedings shall preclude Appellants from raising all relevant legal issues as the District 2 Environmental Commission addresses Appellants' Act 250 permit application; to appeal an adverse District Commission determination; or to request that this appeal be reopened to complete this Court's review of the remaining Questions. Appellants' right to request a re-opening of this appeal shall expire thirty (30) days after the District Commission's dismissal or final determination on Appellants' Act 250 permit application.

In this regard, we decline to approve Appellants' request that this appeal remain open, but inactive, while the District Commission considers Appellants' Act 250 permit application. Our act of concluding this appeal now allows the Court to minimize the number of appeals remaining open or inactive on the Court's docket and does not foreclose any rights Appellants would have, had the appeal remained open, but inactive.

Done at Newfane, Vermont this 24th day of July, 2008.

_____
Thomas S. Durkin, Environmental Judge

11