2006 VT 65

## Robert BEYERS v. WATER RESOURCES BOARD

[910 A.2d 810]

No. 05-400

¶ 1. July 31, 2006. Plaintiff appeals from a superior court order denying his challenge to a Water Resources Board rule regulating public use of Chittenden Reservoir. The challenged portion of the rule imposes a five-mile-per-hour speed limit on motorboats and prohibits water-skiing.* Plaintiff, a riparian landowner, opposes the new restrictions and argues that the Board failed to follow its own statutory and regulatory guidelines when promulgating the rule. We affirm.

### I.

### Factual Background

¶ 2. The Board made the following findings in its written decision. Chittenden Reservoir is located within the Green Mountain National Forest in a relatively remote area of Rutland County. The

---

* Plaintiff does not challenge the rule's prohibition against the use of personal watercraft (jet skis) on the reservoir.

surface area of the reservoir is approximately 702 acres, and the shoreline is largely forested and undeveloped except for approximately ten camps along the western shore. The reservoir is surrounded by mountains, and those on the northeast rise 2,000 feet above the surface water elevation. The clean and clear waters of the reservoir are free from aquatic nuisances and support a fishery that includes yellow perch, largemouth bass, brown trout, and walleye. Numerous bird species rely upon the reservoir for habitat, including loon, osprey, bald eagle, great blue heron, and merganser. The reservoir also provides habitat for mammals, including deer, otter, moose, mink, and beaver. In the words of the Board, the reservoir "provides opportunities for a wilderness-like recreational experience to a degree that is increasingly uncommon in Vermont."

¶ 3. Central Vermont Public Service (CVPS) manages the reservoir as part of a hydroelectric generation system. Between May and October, CVPS periodically releases water from the impoundment system in order to accommodate energy demands and weather changes. These "drawdowns" occur relatively quickly and can alter the water level by as much as five feet. The water level fluctuations result in exposure of a number of otherwise-submerged stumps and rocks.

¶ 4. CVPS also owns the only public boat access to the reservoir. Prior to 1987, CVPS leased this access to the Vermont Department of Fish and Wildlife (DFW), which imposed no restrictions upon use of the boat access or reservoir beyond those applicable to all public waters. Both parties agree that the recreational uses of the reservoir during this period included fishing, canoeing, kayaking, wildlife observation, swimming, quiet enjoyment, and motorboating with small motors. Some riparian landowners also used the reservoir for

waterskiing and high-speed motorboating. In 1989, however, CVPS began directly managing the boat access and posted a sign stating that use of the access ramp was restricted to boats with motors of less than fifteen horsepower. This horsepower limitation also served as a de facto prohibition on waterskiing. In 1997, CVPS returned management of the boat access to DFW, which removed the restrictions.

¶ 5. In 2002, a group of Rutland County residents petitioned the Board under 10 V.S.A. § 1424(e) for new rules for the reservoir, including: (1) a five-mile-per-hour speed limit on motorboats; (2) a prohibition against personal watercraft (jet skis); and (3) a prohibition on waterskiing. Petitioners cited concerns about use conflicts between motorboating and quiet enjoyment, safety risks presented by submerged hazards, threats to loon recovery and aquatic nuisance management, and the potential loss of a uniquely wilderness-like recreational opportunity in the central region of the state.

¶ 6. The Board noticed the proposed rule, invited public comment, and held two public hearings, which generated various concerns. Some residents expressed concern that more intense high-speed motorboating would change the atmosphere of the reservoir, along with other concerns about motorboat safety and environmental and wildlife issues. For example, a biologist from the Vermont Loon Recovery Project wrote to express his opinion that high-speed motorboating subjected loons to stress sufficient to inhibit their recovery. Other citizens, however, opposed any new regulation of the reservoir and suggested that the current rules were adequate. Plaintiff, whose family has enjoyed waterskiing on the reservoir for decades, was among this latter group.

¶ 7. On August 30, 2002, the Board issued a written decision adopting the

proposed regulations. Central to the Board's decision were its conclusions that the reservoir supports a uniquely wilderness-like recreational experience and that high-speed motorboating and water-skiing presented "an unacceptable risk to public safety." The Board also noted that other nearby water bodies provided waterskiing opportunities, including Lakes Bomoseen, Dunmore, and St. Catherine, and reasoned that its duty to provide an appropriate mix of recreational opportunities justified protection of the reservoir's uniquely wilderness-like nature.

¶ 8. In June 2003, plaintiff filed a complaint in Washington Superior Court seeking invalidation of the rule. The superior court rejected plaintiff's arguments and held that issuance of the rule was within the Board's authority to regulate the use of public waters. Plaintiff now appeals.

## II.

### Statutory and Regulatory Background

¶ 9. The Legislature authorized the Board to make rules regarding the use of public waters in order to "further the maintenance of safe and healthful conditions" and "provide for multiple use of the waters in a manner to provide for the best interests of the citizens of the state." 10 V.S.A. § 1421. The Board must attempt to manage multiple and conflicting uses "so that the various uses may be enjoyed in a reasonable manner . . . . To the extent possible, the board shall provide for all normal uses." *Id.* § 1424(c). The statutes authorize the Board to regulate use conflicts by promulgating time, place, and manner restrictions on certain uses, including limits on "the size of motors allowed, size of boats allowed, *allowable speeds for boats*, and prohibiting the use of motors or houseboats." *Id.* § 1424(a)(3) (emphasis added). When imposing one of the above restrictions, the Board must consider:

> the size and flow of the navigable waters, the predominant use of adjacent lands, the depth of the water, the predominant use of the waters prior to regulation, the uses for which the water is adaptable, the availability of fishing, boating and bathing facilities, [and] the scenic beauty and recreational uses of the area.

*Id.* § 1424(b).

¶ 10. The applicable regulations are the Vermont Use of Public Waters Rules (VUPWR), which "provide[] a basis for both avoiding where possible, and resolving when necessary, conflicts in the use of public waters." VUPWR § 1.1, 6 Code of Vermont Rules 12 004 059-1 (Mar. 2006). The underlying goals of the VUPWR are to "consider[] the best interests of both current and future generations of the citizens of the state and insur[e] that natural resource values of the public waters are fully protected." *Id.*

¶ 11. When deciding petitions for rulemaking filed under 10 V.S.A. § 1424(e), the Board must consider the statutory factors enumerated by § 1424(b), plus "the safety and best interests of . . . citizens of the state and the need to provide an appropriate mix of water-based recreational opportunities on a regional and statewide basis." VUPWR § 2.2. The VUPWR also require use conflicts to be resolved "using the least restrictive approach practicable that adequately addresses the conflict." *Id.* § 2.7. When a use conflict involves the operation of motorboats, "priority will be given to managing the manner in which vessels are used or operated, such as by imposing speed limits." *Id.* § 2.9. Furthermore, "[t]hose water bodies which currently provide wilderness-like recreational experiences shall be managed to protect and enhance the continued availability of such experiences." *Id.* § 2.11.

The Board must implement these broad policy goals on a statewide level, with an understanding that problems may "require solutions tailored to the unique circumstances of particular bodies of water." *Id.* § 1.1. We review the Board's decision in light of these statutory and regulatory goals.

## III.

### Legal Analysis

¶ 12. We review the Board's rulemaking decisions to determine whether they are arbitrary, unreasonable, or contrary to law. *In re Town of Sherburne*, 154 Vt. 596, 604, 581 A.2d 274, 278-79 (1990). Our review is "'based solely upon the record of the proceedings before the board.'" *Id.* at 603, 581 A.2d at 278 (quoting 10 V.S.A. § 1270). We review the record to satisfy ourselves that the findings are supported, but we do not reweigh conflicting facts or substitute our judgment for that of the Board. *Id.* at 605-06, 581 A.2d at 279-80. Thus, "[e]ven if the record of the Board's proceedings contains conflicting evidence, the Board's finding on the issue will ordinarily be upheld." *Id.* at 605, 581 A.2d at 279. An administrative decisionmaker like the Board must also "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," but even an explanation of less-than-ideal clarity will be upheld so long as the agency's path may be reasonably discerned. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted).

¶ 13. Plaintiff first challenges the Board's conclusion that waterskiing and high-speed motorboating presented an unacceptable safety risk. Our review of the record reveals that significant concerns about submerged rocks, stumps, and other hazards were raised both during the public hearing and in written comments. Plaintiff acknowledges these

hazards but maintains that the Board improperly weighed this "small, but finite risk" against evidence that no serious waterskiing accident has occurred in recent memory. His argument misses the mark, however, because the Board is authorized to promote safety and determine appropriate levels of risk by both 10 V.S.A. § 1421 (expressing a policy of promoting public safety) and VUPWR § 2.2 (requiring the Board to consider safety risks). Furthermore, the Board's determination was intended to avoid future harm. Having found that a safety risk existed, the Board was not required to wait for actual death or serious injury to occur before promulgating the rule.

¶ 14. Plaintiff next observes that the record contains evidence that several long-distance swimmers have experienced accidents on the reservoir. He argues that it is therefore arbitrary for the Board to regulate waterskiing and motorboating — activities with no past accidents associated with them — based on potential future harm, while not regulating long-distance swimming, an activity that has led to accidents in the past. This argument fails for two reasons. First, the petition presented to the Board did not propose regulation of long-distance swimming, and thus the issue was not before the Board. Second, the Board's decision was based not only upon safety concerns, but also upon a finding that high-speed motorboating and waterskiing conflict with other quiet uses of the reservoir and compromise its general wilderness-like atmosphere. Quiet uses such as swimming, on the other hand, "are compatible with and enhanced by the wilderness-like environment that the Reservoir currently provides." The Board thus adequately explained its reason for regulating motorboating and waterskiing differently from other uses.

¶ 15. Plaintiff argues that the decision was contrary to law because the Board failed to impose "the least restrictive

approach practicable that adequately addresses the conflicts." VUPWR § 2.7. Plaintiff asserts that the least restrictive regulation would be "a combination of common sense and common courtesy, along with the generally applicable boating rules." We note, however, that the status quo is *always* less restrictive than new regulations. Plaintiff also imagines alternatives including an exemption from the rule for shoreline landowners, time and place restrictions (such as prohibiting waterskiing only on weekends between 10:00 a.m. and 6:00 p.m.), and use-frequency restrictions (such as allowing no more than four boats to operate at high speeds at any one time). These proposals fail, however, because the Board found *all* waterskiing and high-speed motorboating to be incompatible with the preservation of the wilderness-like atmosphere currently provided by Chittenden Reservoir. As such, we find no error in the Board's conclusion that no lesser regulation would adequately address the conflicts.

¶ 16. Plaintiff also argues that petitioners did not adequately explain why the proposed regulations were the least restrictive necessary. See VUPWR § 3.7 ("The petitioner shall have the burden of persuasion that the requested exceptions or modifications are consistent with the policies in Section 2 and applicable statutory requirements."). The petition, however, was accompanied by a statement that detailed petitioners' concerns regarding issues of safety, threats to wildlife, and aesthetics. Given the Board's findings regarding the incompatibility of waterskiing and high-speed motorboating with safety and preservation of the reservoir's wilderness-like recreational experience, we hold that petitioners' statement was adequate.

¶ 17. Plaintiff asserts that the Board's decision was contrary to law because the Board failed to follow 10 V.S.A. § 1424(c) and VUPWR § 2.6, which encourage resolution of conflicts in a manner that provides for normal uses to the extent possible. Plaintiff argues that the Board erred by not finding waterskiing and high-speed motorboating to be normal uses of the reservoir. Even if plaintiff were correct, however, no different result would be mandated in this case because the Board expressly found that continued waterskiing and high-speed motorboating is incompatible with the wilderness-like recreational experience provided by the reservoir. We thus find no error.

¶ 18. Finally, plaintiff argues that the Board's rule was arbitrary because the Board has regulated other public waters differently in the past. Plaintiff goes to great lengths to compare the Board's treatment of Chittenden Reservoir with other bodies of water. The Board explained, however, that the reservoir is unique because there is a lack of wilderness-like recreational experiences in the central region of Vermont. See VUPWR § 1.1 (explaining that some management issues "require solutions tailored to the unique circumstances of particular bodies of water"). This justification adequately explains the choice made. See *id.* § 2.11 ("Those water bodies which currently provide wilderness-like recreational experiences shall be managed to protect and enhance the continued availability of such experiences.").

¶ 19. The real thrust of plaintiff's arguments is that the Board should have made a different decision than it did. But it is not the role of the Court to determine whether the Board made the correct policy decision. Our role is only to determine whether the Board acted within the scope of its authority, made findings supported by the evidence, and articulated a rational explanation for its position. We hold that it did.

*Affirmed.*

Motion for reargument denied September 12, 2006.