NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 95

No. 2014-283

In re Stephanie H. Taylor, M.D.

Supreme Court

Board of Medical Practice

November Term, 2014

Patricia King, Chair

Edward G. Adrian of Monaghan Safar Ducham PLLC, Burlington, for Appellant.

William H. Sorrell, Attorney General, and Jacob A. Humbert, Assistant Attorney General, Montpelier, for Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund and Eaton, JJ., and Morse, J. (Ret.), Specially Assigned

¶ 1. **REIBER, C.J.** Dr. Stephanie Taylor appeals from a decision of the Vermont Medical Practice Board denying her request to remove the provisions in a prior stipulation and consent order in which she agreed to a "final and irrevocable" surrender of her medical license and further agreed not to seek relicensure. Dr. Taylor contends that the Board: (1) failed to set forth adequate findings to support its decision; (2) improperly considered the fact that she was represented by counsel in the earlier proceeding; and (3) exceeded its authority by providing that her license surrender would be irrevocable. We agree with the first claim, and therefore reverse and remand.

¶ 2. This disciplinary matter arrives with a long and troubled history. Dr. Taylor received her medical license in Vermont in September 1991. She practiced as a psychiatrist in the Town of Stowe until July 1995, when the Board summarily suspended her license following her loss of hospital privileges at Copley Hospital. Thereafter, in November 1996, Dr. Taylor entered into stipulation and consent order in which she admitted to unprofessional conduct in the form of a "chemical addiction" that posed a "threat to the health, safety and welfare" of her patients; a "mental impairment" that affected her competency to practice; and a "disregard for the fundamental principles of doctor-patient boundaries as they must exist within the psychiatric therapeutic setting." Dr. Taylor agreed that her license would be "indefinitely suspended," and stipulated to numerous conditions for reinstatement, including a prohibition against her "return to the practice of clinical psychiatry"; retraining in a Board-approved residency program; future practice only in a "structured group-practice setting"; completion of a course on the proper prescribing and dispensing of controlled substances; weekly psychotherapy; abstention from the use of any mind or mood altering drugs; and a prohibition against self-prescribing or prescribing for family members.

¶ 3. In June 2000, in response to a request from Dr. Taylor, the Board entered a new and amended consent order. The amended order granted Dr. Taylor a "conditioned license to practice medicine" for the purpose of pursuing a family-practice residency at Tufts University; permitted her to practice only in Massachusetts in activities related to the residency; and reaffirmed the previous requirements and conditions for reinstatement to practice in Vermont outlined in the November 1996 order. At the same time, Dr. Taylor entered into an agreement with the Massachusetts Board of Registration in Medicine which limited her practice in Massachusetts to activities within the family-practice residency, and otherwise placed her on indefinite suspension with numerous requirements for full reinstatement.

2

¶ 4.    In April 2003, following the completion of her residency, Dr. Taylor entered into a further consent order granting her a conditioned license to practice medicine in Vermont, while maintaining many of the prior conditions and restrictions from the November 1996 order, including the provision that she not practice clinical psychiatry, practice only in a structured group setting, and refrain from self-prescribing or prescribing for family members.

¶ 5.    Not long thereafter, in February 2004, the Massachusetts medical board suspended Dr. Taylor's conditional license for failure to comply with its requirement of random drug testing.  After learning of the Massachusetts action and receiving a patient complaint about Dr. Taylor, the Vermont Board opened a new investigation and subsequently entered into an interim consent order temporarily suspending Dr. Taylor's license.  In September 2004, the State filed a lengthy specification of charges, alleging twenty-five separate counts of professional misconduct against Dr. Taylor.  As described therein, these included allegations that Dr. Taylor had "materially breached" provisions of the previous consent orders, "improperly prescribed drugs, violated professional boundaries, ignored Board rules, and failed to adhere to prevailing medical standards."

¶ 6.    The new charges led to a further stipulation and consent order in August 2005.  While entering "no admission" to the charges, Dr. Taylor agreed that the new consent order was "an acceptable means of resolving" the matter and "in the best interests of all parties."  The operative provisions, set forth in Paragraph 11, state that Dr. Taylor "wishes to resolve with finality all matters now pending before" the Board, and that—in lieu of the "time, expense, and uncertainty" of contesting the charges in a public hearing and the possibility of disciplinary action—she has "determined that she shall voluntarily and forthwith SURRENDER to the Vermont Board of Medical Practice her license to practice medicine in the State of Vermont." The paragraph concludes that Dr. Taylor "understands and agrees that such action by her of surrender of her medical license shall be final and irrevocable."  In the following paragraph,

3

Paragraph 12, Dr. Taylor further "agrees and warrants that at no time hereafter shall she seek by any means licensure, reinstatement, or relicensure as a physician in the State of Vermont regardless of circumstances or the passage of time."

¶ 7.    Almost nine years later, in May 2013, Dr. Taylor submitted a letter to the Board requesting that it consider an application for the reinstatement of her medical license. While acknowledging the restrictive provisions of the 2005 consent order, Dr. Taylor claimed that she and her son were then subject to physical and emotional abuse from her former spouse but that they were now "in a very different place." The letter states that she had since received a master's degree in architecture and started her own consulting company advising on patient safety and "healthcare-associated infections"; that her son was grown and doing well; and that she wished to reinstate her medical license so that, in combination with her consulting background, she could work "where people are especially vulnerable to poor sanitation and infectious disease."

¶ 8.    The Board held a hearing on the matter on November 6, 2013. Dr. Taylor appeared and gave a statement elaborating on the representations made in her letter. Following deliberation in closed session, the Board issued a written order stating that it had "voted to require Dr. Taylor to abide by the terms" of the August 2005 consent order in which she had agreed not to apply for relicensure or reinstatement.

¶ 9.    Several months later, in March 2014, respondent submitted—this time through retained counsel—an additional, much more detailed request to the Board for reinstatement. The State filed a response, observing that—although Dr. Taylor's "request ultimately seeks relicensure, a two-step process is required. First the Board must consider whether the restrictive terms in the 2005 Stipulation and Order, ¶¶ 11 and 12, are to be removed." If Dr. Taylor presented "facts and argument sufficient to justify the Board's removal of those restrictive terms, then the second step of the process" would entail remanding the matter to the Board's Licensing Committee "to consider the merits" of relicensure. The State expressly conceded that the Board

4

retained the authority to modify the 2005 Stipulation and Consent Order, and that its "permanent surrender terms do not limit that discretion."

¶ 10. The Board authorized additional briefing, and Dr. Taylor, through counsel, submitted a supplemental memorandum outlining the reasons that the Board "should allow [her] to apply for reinstatement of her license." Dr. Taylor relied on 26 V.S.A. § 3101, which provides that regulation of the medical profession should take "the least restrictive form . . . necessary to protect the public interest," and the corollary principle that the goal of professional sanctions is not to "punish" but to protect the public welfare. She argued that the determination of appropriate sanctions should be an "ongoing process," and that the question for the Board was whether there had been "sufficient passage of time and sufficient rehabilitation" to warrant "a less restrictive means of protecting the public" than an irrevocable surrender. The State's response reiterated its position that the Board "clearly retains the discretion" to "remove ¶¶ 11 and 12 so as to allow [Dr. Taylor] to apply for license reinstatement," and acknowledged that the purpose of professional regulation was to protect the public, but maintained that the request to remove the restrictive terms of the 2005 consent order should be denied.

¶ 11. The Board held a hearing on the matter in July 2014. Dr. Taylor was represented by counsel, and presented sworn testimony on her own behalf. She stated that she was no longer under the physical and emotional strain that she was experiencing in 2004 and 2005; that her son was grown and in medical school; and that her health was good, that she was in a "different place," and that she loved and missed the practice of medicine. Dr. Taylor further testified that she had remarried, had received a master's degree in architecture, had worked for a firm designing hospitals, and since 2012 had run her own company consulting to hospitals to address "healthcare-associated infection rate[s]." She also stated that she teaches an MCAT prep course at the University of Vermont. When asked the reason for her request, Dr. Taylor explained that she was seeking relicensure because of her love of medicine and desire to work with

5

international organizations such as the World Health Organization to address problems related to infectious disease. When asked how she would avoid the problems she had experienced in the past, she offered to work under "close supervision" and "ongoing monitoring" with restricted prescription-writing privileges. Her attorney acknowledged that Dr. Taylor was "clear that she knew that she was irrevocably surrendering her license" in 2005 but argued that "[a] lot can happen in nine years," that Dr. Taylor had rehabilitated herself, and that she had "demonstrated sufficiently that lifting those conditions and entering a relicensing process would [not] put the public health, safety, and welfare at risk."

¶ 12. The State presented no evidence at the hearing, but argued against removal of the restrictive provisions in the 2005 consent order. While acknowledging that the Board "retained discretion" to modify the consent order "even in the face of an irrevocable license suspension," the State urged the Board to be "mindful" of Dr. Taylor's demonstrated and repeated inability to conform to the Board's prior orders.

¶ 13. Following the hearing, the Board went into closed session to deliberate, and shortly thereafter issued a one-page written decision addressed to Dr. Taylor's request "to make it possible for her to apply for license reinstatement by removing conditions 11 and 12 of a Stipulation and Consent Order she had agreed to in July 2005." The Board's decision notes Dr. Taylor's argument that "nine years had passed since she had agreed to surrender her license and . . . that surrender of her license was simply no longer necessary to protect the public," as well as the State's request "to consider the fact that Dr. Taylor's past conduct had not only involved potential threats to the health, safety, and welfare of her patients, but also, a "fundamental lack of appreciation for the board's authority." The Board then explains that, following deliberations, it had "voted unanimously to reject Dr. Taylor's request to remove Conditions 11 and 12 from the Stipulation and Consent Order," and that accordingly it would not engage "in any further consideration of Dr. Taylor's request." This appeal by Dr. Taylor followed. See 26 V.S.A. §

6

1367 ("A party aggrieved by a final order of the [Board] may . . . appeal that order to the Vermont supreme court on the basis of the record created before the board.").

¶ 14. The Board is "broadly empowered" with discretion and authority in medical licensing matters "for the purpose of protecting the public." Perry v. Med. Practice Bd., 169 Vt. 399, 403, 737 A.2d 900, 903 (1999) (quotation omitted). Thus our review of Board decisions is broadly deferential. "We will affirm the Board's findings as long as they are supported by substantial evidence, and its conclusions if rationally derived from the findings and based on a correct interpretation of the law." Braun v. Bd. of Dental Exam'rs, 167 Vt. 110, 114, 702 A.2d 124, 127 (1997). The traditional deference accorded to agency decisions is further enhanced where, as here, the Board evaluating a professional's conduct is composed of "a group of . . . peers." Id.

¶ 15. Although comprised largely of health care professionals rather than lawyers or judges, administrative decision makers like the Board still must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Beyers v. Water Res. Bd., 2006 VT 65, ¶ 12, 180 Vt. 605, 910 A.2d 810 (mem.). This requirement is essential not only to provide some understanding and closure to the parties, but also a meaningful basis for review by this Court in the event of appeal. See Agency of Natural Res. v. Irish, 169 Vt. 407, 419, 738 A.2d 571, 580 (1999) (noting decision-maker's "duty to make all findings necessary to support its conclusions resolve the issues before it, and provide an adequate basis for appellate review").

¶ 16. Dr. Taylor contends that the Board failed to make adequate findings to explain its decision. We are constrained to agree. As noted, Dr. Taylor submitted substantial pleadings outlining her case for modification of the restrictive provisions in the 2005 consent order, and presented sworn testimony and argument at the hearing in support of the request. Her case consisted of several parts, based on the substantial passage of time, beneficial changes in her

7

personal life and circumstances, acquisition of an additional advanced degree and vocation, sustained commitment to her new architectural consulting business, and a strong desire to combine her new profession with the practice of medicine to advance the cause of world health. Her attorney argued that Dr. Taylor had demonstrated that continued suspension of her license was no longer necessary to protect the public, and that less restrictive means were available, including a conditional relicensure with oversight, mentoring, testing, and other protections in place. While the State presented no evidence, it argued that Dr. Taylor's evidence was inadequate to overcome a past replete with broken promises.

¶ 17. Although the Board's decision briefly notes the parties' arguments, it contains no findings or reasoning to support its denial of Dr. Taylor's request to remove the restrictive provisions in the 2005 consent decree and thereby allow her to move forward with her request for relicensure. As we have frequently observed, a mere "recitation" of the parties' arguments or evidence is not a substitute for actual findings and conclusions. In re Hale Mountain Fish & Game Club, 2007 VT 102, ¶ 9, 182 Vt. 606, 939 A.2d 498 (mem.) (quotation omitted). We have no way of determining from the Board's summary ruling whether it was based on a rejection of Dr. Taylor's credibility, the insufficiency of her showing of "rehabilitation" or changed circumstances, the inadequacy of her proposed conditions of relicensure to protect the public, or some other reason or combination thereof. The Board may also have considered, as the State here notes, that the stipulation enabled Dr. Taylor to avoid more damaging evidence and findings. As noted, however, the Board's decision does not explain the underlying basis of its ruling.

¶ 18. The deference that this Court entrusts to the Board depends substantially on the findings that underlie its decisions. The Board must state its findings and conclusions with sufficient clarity that that we may defer with confidence to the judgments that fall within its

8

expertise. Otherwise, we risk overstepping our proper role on review by substituting our view of the evidence and the merits in place of the Board's. We decline that undertaking.

¶ 19. The State argues briefly, in response, that findings are unnecessary "when the Board considers a motion in the nature of V.R.C.P. 60." The State consistently and persuasively maintained below, however, that Dr. Taylor's request was not a motion for relief from judgment but rather a modification motion specifically authorized by Board Rules, and that Dr. Taylor was fully entitled to bring such a motion notwithstanding the restrictive provisions in the 2005 consent order. See Rules of the Board of Medical Practice, Rule 17.2, 4A Code of Vt. Rules 13 141 001-19, http://www.lexisnexis.com/hottopics/code_of_vtrules. ("A person licensed or certified by the Board who has been disciplined may petition at a later date for license reinstatement or modification or removal of conditions."). The evidentiary hearing held by the Board was thus clearly in the nature of a regular contested-case hearing for which findings were required. See 3 V.S.A. § 812(a) (agency decisions "shall include findings of fact and conclusions of law").

¶ 20. Having been left in a position here "where we must speculate as to the basis of the decision reached," we conclude that a remand to the Board for further findings is appropriate and essential. Agency of Natural Res. v. Upper Valley Landfill Corp., 167 Vt. 228, 242, 705 A.2d 1001, 1010 (1997). On remand, the Board may rely on the existing record, or reopen the hearing for further evidence. This may include evidence relating to the charges that resulted in the stipulation. As noted, the Board's rules expressly provide that a person "who has been disciplined may petition at a later date for . . . modification," and the State here acknowledged Dr. Taylor's right to seek a modification to remove the conditions in the order permanently revoking her license. We also recognize, however, that the procedure established by the Board places the State at a disadvantage in opposing such a motion where—as here—the disciplinary order resulted from a stipulation that effectively ended the process whereby damaging evidence

9

would have been introduced, evidence that may now be difficult to obtain, and relieved respondent of the need to respond. Fairness, therefore, requires that the State be afforded an opportunity—at its request—to pursue the charges and adduce evidence relating to them, or enter into a new stipulation with respondent detailing the misconduct. Fairness also permits the Board, in evaluating Dr. Taylor's motion, to take account of her admission that the stipulation was "in the best interests of all the parties," and to consider the nature and gravity of the original charges and the pattern of behavior over time that they may reveal.[*]

¶ 21. Dr. Taylor's remaining claims require no extended discussion. She asserts that that the Board was not statutorily empowered to authorize an "irrevocable surrender" of her license as provided in the 2005 consent order. As noted, however, Dr. Taylor expressly stipulated to this disposition, and neither appealed nor challenged the propriety of the 2005 order until nearly nine years later. As such, the order is final and may not be collaterally attacked in this fashion. See Bd. of Med. Practice v. Perry-Hooker, 139 Vt. 264, 267, 427 A.2d 1334, 1335-36 (1981) (holding that physician could not collaterally attack basis of final order of revocation from New Hampshire on ground that underlying criminal conviction was invalid); see also Natural Res. Bd. v. Dorr, 2015 VT 1, ¶ 14, ___ Vt. ___, 113 A.3d 400 (claim that administrative agency lacked statutory authority to act did not involve issue of fundamental subject matter jurisdiction that could be raised at any time).

¶ 22. Dr. Taylor further contends that the Board improperly considered that she was represented by counsel when she entered into the 2005 consent order. She cites the Board's initial decision in November 2013, in which it noted that the assistant attorney general representing the State had "pointed out that Dr. Taylor had been represented by counsel when

---

[*] We also recognize that the Board's rule authorizing a person who has been disciplined to petition "at a later date for . . . modification or removal of conditions" could invite frivolous or even successive motions, and nothing in our holding is intended to constrain the Board from summarily resolving such a motion, so long as the basis of its decision is reasonably clear.

she signed the Stipulation." The State also later argued that the fact Dr. Taylor was represented would be relevant if she claimed that she did not sign the order knowingly or voluntarily, and one Board member at the hearing also observed that Dr. Taylor was represented by counsel when she signed the order.

¶ 23. As we have explained, the precise basis of the Board's decision remains unclear due to a lack of findings and reasoning, and the matter must be remanded accordingly. On remand, however, we discern no reason or authority that would preclude the Board from considering that Dr. Taylor was represented by counsel when she signed the consent order, to the extent that it considers her understanding of the agreement to be relevant. See In re Hemingway, 2014 VT 42, ¶ 15, 196 Vt. 384, 93 A.3d 896 (in assessing whether petitioner entered plea agreement knowingly and voluntarily, court may consider all relevant circumstances, including "his representation by counsel").

Reversed and remanded for further findings and conclusions.

FOR THE COURT:

Chief Justice

¶ 24. **DOOLEY, J., concurring and dissenting.** I agree with the majority that petitioner cannot challenge the power of the Board to order an irrevocable revocation of her license because petitioner stipulated to this relief. Indeed, petitioner stipulated to more: "Respondent expressly agrees that hereinafter the Board may and shall return to her without action or obligation of due process of any kind any application, motion, petition, or other writing from her with regard to licensure, reinstatement, or relicensure." Despite its holding and the provision of the stipulation, the majority reverses the denial of license reinstatement for lack of findings and a statement of reasons. In the absence of any standards for reinstatement, and in

light of the stipulation that the Board "may and shall" return the petition "without action or obligation of due process of any kind," I think the majority is imposing an unnecessary and pointless burden on the Board, which simply enforced the terms of the 2005 stipulation and order as they were written, as they were asked to do by the State. I would affirm.

¶ 25. I am writing, however, to emphasize that the terms of the stipulation require more than so far has been recognized if the Board goes further than denying the request for reinstatement as inconsistent with its 2005 order. While, as the State has conceded, the Board has the power to reinstate petitioner to medical practice despite the 2005 order, the petition for reinstatement was a violation of the 2005 stipulation, which states: "Respondent agrees and warrants that at no time hereafter shall she seek by any means licensure, reinstatement, or relicensure as a physician in the State of Vermont, regardless of circumstances or the passage of time." The stipulation is a contract between petitioner and the State to settle the twenty-five-count specification of charges the State filed in 2004. See Marble Bank v. Heaton, 160 Vt. 188, 192, 624 A.2d 365, 367 (1993) (observing that stipulation is contractual and governed by contract rules). By entering into the settlement contract, petitioner avoided facing those charges and the result of the adjudication of those charges. The substantive basis of petitioner's request for reinstatement has always been that, as of the date of her letter of request to the Board, her life is in "a very different place" from where it was when the suspension occurred and a physician's license would "increase opportunities in [her] present work" as an architect of medical facilities and allow her to get into "disaster relief." This was a request to obtain all the benefit from the 2005 stipulation, leaving behind the conduct that caused the charges against her and returning to practice as if nothing had ever occurred. It was also a request for the Board to ignore her breach of the stipulation contract.

¶ 26. Violation of the stipulation gives the State the power to reopen the 2004 proceedings and proceed to hearing on the twenty-five-count complaint. See Spaulding v.

Cahill, 146 Vt. 386, 388, 505 A.2d 1186, 1188 (1985) (stating that when settlement agreement is breached nonbreaching party may enforce either original claim or settlement agreement). While acknowledging the extraordinary burden placed on the State, the majority appears to agree with this right of the State.

¶ 27. I believe we have to go further in enforcing the right of the State in view of the fact that the events that gave rise to the professional misconduct complaint occurred more than ten years ago. Again, only if the Board decides in response to the remand to go beyond a dismissal of the petition, I believe that petitioner must be required to either admit the charges in the 2004 complaint or enter into a new stipulation acceptable to the State detailing her conduct in 2004 and earlier that breached the Code of Medical Ethics, the terms of her medical license or any other legal or professional norms. This action would establish the proper starting point from which to consider whether the public would be properly protected if petitioner's license were restored.

¶ 28. I am authorized to state that Justice Morse (Ret.) joins this concurrence and dissent.

                                    _____

                                    Associate Justice